

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-29-2003

# Cybergenics Corp v. Chinery

Precedential or Non-Precedential: Precedential

Docket 01-3805

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Cybergenics Corp v. Chinery" (2003). *2003 Decisions.* Paper 497.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/497

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 29, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3805

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF CYBERGENICS CORPORATION,
ON BEHALF OF CYBERGENICS CORPORATION,
DEBTOR IN POSSESSION,

*Appellant*

v.

*KATHLEEN CHINERY, Executrix of the Estate of Scott
Chinery; L&S RESEARCH CORPORATION; LINCOLNSHIRE
MANAGEMENT INC.; LINCOLNSHIRE EQUITY FUND, L.P.;

(*Amended per order dated 11/19/01)
(Amended per order dated 3/21/02)

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 98-3109 (GEB))
District Judge: Honorable Garrett E. Brown, Jr.

Argued: February 19, 2003

Before: BECKER,* *Chief Judge*, SLOVITER, SCIRICA,**
ALITO, ROTH, McKEE, RENDELL, BARRY, AMBRO,
FUENTES and SMITH, *Circuit Judges.*

* Judge Becker completed his term as Chief Judge on May 4, 2003.

** Judge Scirica succeeded to the position of Chief Judge on May 4, 2003.

(Filed: May 29, 2003)

GARY D. SESSER (Argued)
JAMES GADSDEN
ROXANNA D. NAZARI
Carter, Ledyard & Milburn
2 Wall Street
New York, NY 10005

*Counsel for Appellant*
*Official Committee of Unsecured*
*Creditors of Cybergenics Corp.*

BRIAN J. MOLLOY (Argued)
LAUREN D. DALOISIO
Wilentz, Goldman & Spitzer
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, New Jersey 07095

*Counsel for Appellees*
*Chinery and L&S Research*
*Corporation*

BRUCE E. FADER (Argued)
SCOTT A. EGGERS
Proskauer Rose LLP
1585 Broadway
New York, NY 10036

*Counsel for Appellees*
*Lincolnshire Management, Inc.*

JONATHAN C. LIPSON***
Assistant Professor of Law
University of Baltimore School
 of Law
1420 North Charles Street
Baltimore, MD 21201

*Amicus Law Professors in support of*
*Appellant*

---

*** Joining Professor Lipson on the brief are Professors Ralph Brubaker, Daniel J. Brussel, Kenneth N. Klee, Stephen J. Lubben, Walter J. Taggart, Elizabeth Warren, and William J. Woodward.

G. ERIC BRUNSTAD, JR. (Argued)
JULIA FROST-DAVIES
RHEBA RUTKOWSKI
BRYAN D. SHORT
TANYA TYMCHENKO
MELISSA G. LIAZOS
JUSTIN M. O'SULLIVAN
SETH A SCHWARTZ
RACHEL A. VISCOMI
STEVEN M. ACKLEY-ORTIZ
SERENA D. MADAR
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

*Amicus in support of Appellant*

TERESA K.D. CURRIER
ERIC LOPEZ SCHNABEL
JEFFREY R. WAXMAN
Klett Rooney Lieber & Schorling
The Brandywine Building
1000 West Street, Suite 1400
Wilmington, DE 19801

DANIEL H. GOLDEN
DAVID H. BOTTER
ROBERT J. STARK
Akin Gump Strauss Hauer &
 Feld LLP
590 Madison Avenue
New York, NY 10022

*Counsel for Amicus Committee of*
*Unsecured Creditors of Hayes*
*Lemmerz International, Inc. in*
*support of Appellant*

LUC A. DESPINS
SUSHEEL KIRPALANI
ROY C. STUDNESS
Milbank, Tweed, Hadley &
 McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

*Counsel for Amicus Official
Committee of unsecured Creditors of
Safety-Kleen Corp. in support of
Appellant*

GEORGE R. HIRSCH (Argued)
ELYSSA S. KATES
Bressler, Amery & Ross, P.C.
P.O. Box 1980
Morristown, NJ 07962

*Counsel for Amicus Smurfit-Stone
Corp. in support of Appellees*

KEITH SHARFMAN
Associate Professor of Law
Rutgers University School of Law
123 Washington Street
Newark, NJ 07102

*Amicus in support of Appellees*

## OPINION OF THE COURT

BECKER, *Circuit Judge.*

## CONTENTS

I. Introduction .............................................................. 6

II. Facts and Procedural History .................................. 7

III. How Does *Hartford Underwriters* Affect this Case?
........................................................................... 10

5

    A. What happened in *Hartford Underwriters?* ...... 11
    B. Did *Hartford Underwriters* take place in an
       analogous context? ......................................... 14

IV. Do Derivative Suits under § 544(b) Survive *Hartford Underwriters*? .............................................. 16
    A. The Code Itself .............................................. 16
       1. The Need to Interpret Chapter 11 as a
          Whole ...................................................... 17
       2. Section 1109(b) ..................................... 19
       3. Section 1103(c)(5) ................................. 22
       4. Section 503(b)(3)(B) .............................. 23
       5. A Textual Conclusion ............................ 28
    B. Bankruptcy Courts as Courts of Equity ......... 30

V. Pre-Code Practice ................................................. 32

VI. Does Derivative Standing for Creditors' Committees Advance Congress's Goals? ...................................... 37
    A. The Salutary Effects of Derivative Standing for
       Creditors' Committees ...................................... 38
    B. Potential Drawbacks of Derivative Standing for
       Creditors' Committees ...................................... 41
       1. Might derivative suits dissipate the value
          of the estate ........................................... 41
       2. Might bankruptcy courts be unable to
          identify meritorious claims ...................... 43
       3. Might derivative suits consume judicial
          resources ................................................. 44
    C. Possible Substitutes for Derivative Standing for
       Creditors' Committees ...................................... 45
       1. Appointment of a bankruptcy trustee ...... 45
       2. Appointment of an examiner with
          authority to sue ...................................... 46
       3. Moving the court to order the debtor-in-
          possession to sue .................................... 48
       4. Converting the bankruptcy case to
          Chapter 7 ............................................... 48
       5. Moving the bankruptcy court to authorize
          a committee to bring a post-confirmation
          avoidance action ..................................... 49
       6. Summary ............................................... 50

VII. Conclusion ......................................................... 50

## I. Introduction

This is an appeal from an Order of the District Court, which set aside an Order of the Bankruptcy Court authorizing a creditors' committee ("the Committee") to sue on the estate's behalf to avoid a fraudulent transfer in a Chapter 11 proceeding. Before seeking derivative standing, the Committee had unsuccessfully petitioned the debtor-in-possession to pursue the avoidance claim. In granting derivative standing, the Bankruptcy Court determined that such a suit would be in the estate's best interest. The question on appeal is whether the decision of the United States Supreme Court in *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000), a Chapter 7 case which interpreted the text of 11 U.S.C. § 506(c) to foreclose anyone other than a trustee from seeking to recover administrative costs on its own behalf, operates to prevent the Bankruptcy Court from authorizing the suit described above.

We conclude that it does not. While the question in *Hartford Underwriters* was one of a *nontrustee's right* unilaterally to circumvent the Code's remedial scheme, the issue before us today concerns a *bankruptcy court's equitable power* to craft a remedy when the Code's envisioned scheme breaks down. We believe that Sections 1109(b), 1103(c)(5), and 503(b)(3)(B) of the Bankruptcy Code evince Congress's approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim. Our conclusion is consistent with the received wisdom that "[n]early all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession if the committee is able to establish" that a debtor is neglecting its fiduciary duty. 7 *Collier on Bankruptcy* ¶ 1103.05[6][a] (15th rev. ed. 2002).

Accordingly, we will reverse the judgment of the District Court and remit the case to the original Panel so that it may consider the other grounds for the District Court's reversal of the Bankruptcy Court's Order, which were not argued before the *en banc* Court.

## II. Facts and Procedural History

Scott Chinery founded L&S Research Corporation ("L&S") in 1985.[1] L&S, with Chinery as its sole shareholder, marketed nutritional food supplements for bodybuilding and weight loss under the brand name "Cybergenics." In 1994, Lincolnshire Management, Inc. ("Lincolnshire") initiated negotiations with Chinery to buy L&S, and the parties reached an agreement for an aggregate consideration of approximately $110.5 million.[2] Lincolnshire established Cybergenics Acquisition, Inc., an equity investment affiliate, which later became Cybergenics Corporation ("Cybergenics"), to acquire substantially all of L&S's assets. Lincolnshire's equity investment affiliate provided the largest equity stake and became the majority shareholder in Cybergenics, although several banks and various other lenders ("the Lenders") helped to finance the asset purchase. These financiers also agreed to provide working capital for Cybergenics after the acquisition. The buyout was memorialized in a writing dated October 13, 1994.

Cybergenics's financial outlook soon worsened. Despite increased equity investments by Lincolnshire and the Lenders, in August 1996, Cybergenics filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As is customary in Chapter 11 reorganizations, the bankruptcy court allowed Cybergenics to remain in control of its assets as a debtor-in-possession, so that no bankruptcy trustee was appointed. As is also customary, the United States trustee appointed a creditors' committee ("the Committee") to represent the interests of Cybergenics's unsecured creditors.

Although the traditional Chapter 11 case involves a business reorganization rather than a liquidation, Cybergenics soon determined that its situation was

---

1. Scott Chinery died on October 24, 2000. Kathleen Chinery, his wife and the executrix of his estate, has been substituted as a defendant in this case.

2. This amount was later reduced to $60 million in settlement of a lawsuit by Lincolnshire against L&S and Chinery alleging fraud, breach of fiduciary duty, and breach of contract relating to the sale.

unsalvageable, and it chose to sell its assets through a court-supervised auction. At the auction, a third party successfully bid $2.65 million for all of Cybergenics's assets, and the Bankruptcy Court approved the sale in October 1996. Cybergenics then moved to dismiss the bankruptcy case, but the Committee objected, asserting that certain transactions relating to the leveraged buyout could give rise to substantial fraudulent transfer actions and that a debtor-in-possession has a fiduciary duty to maximize the value of the estate.

In June 1997, Cybergenics notified the bankruptcy court that it would not pursue any fraudulent transfer claims, arguing that the probability of recovery was sufficiently low that the costs of litigation would likely outweigh any benefits. The Committee responded by volunteering to bear all of the costs so that the avoidance action would go forward, but when Cybergenics still refused to pursue the claims, the Committee sought leave from the Bankruptcy Court to bring a derivative action to avoid the transfers for the benefit of the estate. After a hearing, the Bankruptcy Court concluded that the fraudulent transfer claims were colorable and that Cybergenics's refusal to prosecute them was unreasonable given the Committee's offer to bear the litigation costs. It therefore authorized the Committee to proceed derivatively. The Committee filed its complaint in March 1998 under 11 U.S.C. § 544(b), seeking to avoid fraudulent transfers to the Lenders, Lincolnshire, L&S, and Chinery.

The defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing, *inter alia*, that the fraudulent transfer claims that the Committee asserted had been sold in the 1996 bankruptcy asset sale. The District Court granted the defendants' motions and dismissed the Committee's complaint for lack of subject matter jurisdiction. It held that the fraudulent transfer claims were assets of the debtor, and that because the 1996 bankruptcy asset sale disposed of all of Cybergenics's assets, the claims were no longer property of the bankruptcy estate, so the Committee could not raise them on the estate's behalf. On appeal, we reversed and remanded, holding that while sections 544 and 1107 combine to give a debtor the power

to pursue these remedies normally reserved for creditors, these causes of action are not "assets" of the debtor, and therefore were not transferred in a sale of the debtor's assets. *In re Cybergenics Corp.*, 226 F.3d 237, 245 (3d Cir. 2000).

On remand, the defendants again moved to dismiss. They raised several grounds for dismissal that they had asserted in their previous motions to dismiss and that we had declined to reach in *Cybergenics*. 226 F.3d at 241 n.5. They also argued for the first time that, while fraudulent transfer claims technically "belong" to creditors, § 544(b) states only that "the trustee may" avoid fraudulent transfers — it does not mention creditors' committees. They further argued that pursuant to the Supreme Court's reasoning in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1 (2000) (interpreting "the trustee may" in § 506(c) of the Bankruptcy Code to exclude all parties except the trustee), § 544(b)'s grant of standing is exclusive and does not extend to creditors' committees.

On October 31, 2001, the District Court granted the defendants' renewed motions to dismiss and held that the Committee could not bring suit under § 544(b). It concluded that the Supreme Court's interpretation of "the trustee may" in *Hartford Underwriters* governed the meaning of the same language in § 544(b). In so doing, it rejected the Committee's argument that the holding in *Hartford Underwriters* did not extend to analysis of *derivative* standing, even though the Supreme Court had explicitly noted that derivative standing was not at stake in that case. *See Hartford Underwriters*, 530 U.S. at 13 n.5 ("Whatever the validity of [derivative standing], it has no analogous application here . . . . Petitioner asserted an independent right to use § 506(c), which is what we reject today."). The District Court also provided several alternative grounds for dismissal.[3]

---

3. These include conclusions that: (1) the Committee could identify no present creditor, a requirement for maintaining an action to avoid a fraudulent transfer; (2) Cybergenics had no unpaid creditors holding unsecured claims at the time of the alleged fraudulent transfer; (3) the heightened pleading standard of Fed. R. Civ. Proc. 9(b) is applicable to the Committee's complaint, and it failed to plead with sufficient particularity; (4) the Committee was not entitled to amend its complaint under Fed. R. Civ. Proc. 17(a); and (5) the Committee abandoned its claim of equitable subordination.

The Committee timely appealed, and in an opinion dated September 20, 2002, a Panel of this Court affirmed the District Court's holding that § 544(b) did not authorize derivative standing for creditors' committees to sue to avoid allegedly fraudulent transfers. *Official Committee of Unsecured Creditors of Cybergenics Corporation v. Chinery*, 304 F.3d 316 (3d Cir. 2002). The Panel's analysis did not reach the District Court's alternate grounds for dismissal, as those rationales assumed the existence of derivative standing.

On November 18, 2002, we granted the Committee's timely motion for rehearing *en banc* and accordingly vacated the Panel decision. We have since accepted extensive supplemental briefing, including a number of amicus briefs, and heard oral argument by the parties and *amicus curiae.*

## III. How Does *Hartford Underwriters* Affect this Case?

The District Court's conclusion that the Code does not permit creditors' committees derivatively to prosecute fraudulent transfer claims was grounded in its determination that the language in § 544(b) vests exclusive standing in the trustee. Section 544(b)(1) states that:

> Except as provided in paragraph (2), *the trustee may* avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b) (emphasis added). The District Court's determination of exclusivity relied critically on *Hartford Underwriters*, 530 U.S. 1 (2000), in which the Supreme Court determined that identical language in § 506(c) of the Code foreclosed the right of any nontrustee to prosecute that particular action. The District Court concluded that "there is no principled basis under which the Court can apply different meanings to the words 'the trustee may' in separate sections of the Code," so it considered *Hartford Underwriters* dispositive.

## A. What happened in *Hartford Underwriters?*

In *Hartford Underwriters*, debtor Hen House Interstate, Inc. obtained workers' compensation insurance from petitioner Hartford Underwriters as part of its Chapter 11 reorganization strategy. Although Hen House repeatedly failed to pay its monthly premiums, Hartford, which knew nothing of Hen House's bankruptcy, continued to provide insurance. When the reorganization attempt fell through, Hen House converted its case to a Chapter 7 liquidation and a trustee was appointed. Hartford, alerted to the bankruptcy, sought to recover approximately $50,000 in overdue premiums from the bankruptcy estate but found it almost entirely without unencumbered assets.

Section 503(b)(1)(A) of the Bankruptcy Code provides that "the actual, necessary costs and expenses of preserving the estate" are treated as administrative expenses, and § 507(a)(1) provides that such administrative expenses are entitled to priority over pre-petition unsecured claims. Hartford and Hen House agreed that the overdue premiums constituted administrative expenses, but Hartford was nevertheless stymied, for virtually all of Hen House's assets were held by *secured* creditors, whose claims are superior to administrative claims. *See* 11 U.S.C. § 506. Hartford then looked to § 506(c), which provides an important exception to that priority. It states that "*[t]he trustee may* recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c) (emphasis added). Hartford argued that this provision entitled it to recover the premiums even though it was an administrative claimant rather than a trustee. The bankruptcy court ruled in favor of Hartford, and the district court and an Eighth Circuit panel affirmed. *In re Hen House Interstate, Inc.*, 150 F.3d 868 (8th Cir. 1998). The panel decision was subsequently vacated, and the Eighth Circuit, sitting *en banc*, held § 506(c) unavailable to an administrative claimant like Hartford. 177 F.2d 719 (8th Cir. 1999) (en banc).

A unanimous Supreme Court affirmed the *en banc* decision. It began "with the understanding that Congress

says in a statute what it means and means in a statute what it says there," *Hartford Underwriters*, 530 U.S. at 6 (quoting *Connecticut Nat. Bank. v. Germain*, 530 U.S. 249, 254 (1992)), and reiterated the longstanding maxim that, "when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Id.* (citations omitted). Turning to § 506(c), the Court found that it "appears quite plain[ly]" to mean that only the trustee may recover administrative expenses ahead of secured claims. *Id.* Although it acknowledged that the statute does not expressly bar non-trustees from recovery, it had "little difficulty" in inferring that "exclusivity is intended." *Id.*

The Court's first rationale was contextual. A bankruptcy trustee's role in Chapter 7 liquidation proceedings is central by design, and this "unique role . . . makes it entirely plausible that Congress would provide a power to him and not to others." *Id.* at 7. The Court further reasoned that, "had no particular parties been specified [in § 506(c),] . . . the trustee is the most obvious party who would have been thought empowered to use the provision." *Id.* The Court therefore found little reason to doubt the maxim that "a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Id.* (citing 2A N. Singer, *Sutherland on Statutory Construction* § 47.23, p. 217 (5th ed. 1992)). Buttressing this conclusion was the logic that, "had Congress intended the provision to be broadly available, it could simply have said so, as it did in describing the parties who could act under other sections of the Code." *Id.*

Having determined from its textual inquiry that "by far the most natural reading of § 506(c) is that it extends only to the trustee," the Court declared that Hartford's "burden of persuading us that the section must be read to allow its use by other parties is 'exceptionally heavy.'" *Id.* at 9 (quoting *Patterson v. Shumate*, 504 U.S. 753, 760 (1992)). It then turned to Hartford's arguments based on pre-Code practice and policy considerations. Regarding pre-Code practice, the Court found that Section 506(c)'s provision for

the charge of certain administrative expenses against lienholders continued a practice that existed under the Bankruptcy Act of 1898. *Id.* (citations omitted). Even then, however, "[i]t was the norm that recovery of costs from a secured creditor would be sought by the trustee," rather than by an administrative claimant. *Id.* (citations omitted). Still, Hartford cited "a number of lower court cases [ ] in which — without meaningful discussion of the point — parties other than the trustee were permitted to pursue such charges under the Act [of 1898], sometimes simultaneously with the trustee's pursuit of his own expenses," *id.* (citing cases), and the Court recognized that some of its early decisions had allowed individual claimants to seek recovery from secured assets. *See*, *e.g.*, *Louisville, E. & St. L. R. Co. v. Wilson*, 138 U.S. 501 (1891).

The Court nevertheless concluded that "[i]t is questionable whether these precedents establish a bankruptcy practice sufficiently widespread and well recognized to justify the conclusion of implicit adoption by the Code. We have no confidence that the allowance of recovery from collateral by nontrustees is the type of rule that . . . Congress was aware of when enacting the code." *Id.* (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 246 (1989)). *Cf. Kelly v. Robinson*, 479 U.S. 36, 46 (1986) (giving weight to pre-Code practice that was "widely accepted" and "established"). Indeed, the Court strongly implied that even a more convincing historical showing would not have carried the day for Hartford: "Where the meaning of the Bankruptcy Code's text is itself clear . . . its operation is unimpeded by contrary . . . prior practice. . . . In this case, we think the language of the Code leaves no room for clarification by pre-Code practice," for it "cannot transform § 506(c)'s reference to 'the trustee' to 'the trustee and other parties in interest.' " *Id.* at 11 (citations omitted).

Finally, the Court engaged Hartford's contention that its interpretation was necessary as a matter of public policy. Hartford argued that in some cases the trustee may lack an incentive to pursue payment for administrative expenses, so that if the Code is to encourage such lenders to finance a corporation's administrative needs throughout its

bankruptcy, it must allow those lenders later to bring their own actions to recover their investments. Hartford also suggested that affording standing to administrative claimants might encourage the provision of post-petition services to debtors on more favorable terms, since such claimants would presumably always be willing vigorously to defend their financial interests whereas a trustee might be more reluctant. *Id.* at 11-12. The Court, however, determined that "it is far from clear that the policy implications favor petitioner's position," and even suggested that Hartford's interpretation might "itself lead to results that seem undesirable as a matter of policy." *Id.* at 12. It ultimately declined to weigh the competing concerns, explaining that "we do not sit to assess the relative merits of different approaches to bankruptcy problems. It suffices that the natural reading of the text produces the result we announce. Achieving a better policy outcome — if what petitioner urges is that — is a task for Congress, not the courts." *Id.* at 13-14.

## B. Did *Hartford Underwriters* take place in an analogous context?

Based on the above reasoning, the *Hartford Underwriters* Court interpreted "the trustee may" in § 506(c) to mean that *only* the trustee may bring an action. In the case at bar, the District Court concluded that, faced with the same language in § 544(b), the same conclusion must there obtain. But the *Hartford Underwriters* Court expressly reserved the question before us today. In a footnote critical to understanding the scope of that decision, the Supreme Court stated:

> We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery under § 506(c). *Amici* American Insurance Association and National Union Fire Insurance Co. draw our attention to the practice of some courts of allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions, *see* 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee. *See, e.g., In re Gibson Group, Inc.*, 66 F.3d 1436, 1438

(CA6 1995). Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead. Petitioner asserted an independent right to use § 506(c), which is what we reject today.

*Id.* at 13 n.5. The District Court nevertheless concluded that the Committee failed sufficiently to distinguish *Hartford Underwriters*'s method of interpretation, which it found to yield equally compelling results when applied to § 544(b).

We agree that *Hartford Underwriters* is most useful for the interpretive methodology it offers, but it is critical to note the context in which that decision arose, for it is materially unlike the one before us today. The petitioner in *Hartford Underwriters* was an insurer who, by continuing coverage despite Hen House's failure to pay its premiums, became an administrative lender with claims subordinate to those of the secured creditors. When it learned of Hen House's bankruptcy, it attempted to use § 506(c) to recover the premiums it was owed, but it did so in a strikingly unilateral fashion. The insurance premiums were not costs incurred by the trustee that, if recovered, would have yielded a common benefit. Instead, they would have satisfied only Hartford's outstanding claim. Nor did Hartford seek the court's or the trustee's permission to recoup the expense, but rather it sued in its own name and for its own direct benefit.

The situation at bar is markedly different. When the Committee discovered that certain transfers made by Cybergenics were potentially avoidable as fraudulent, it first petitioned the Cybergenics management to file an avoidance action under § 544(b).[4] But management refused to file that action, claiming that the costs would likely outweigh the benefits, and it maintained this position even after the Committee volunteered to bear all litigation costs. The

---

4. As discussed more fully *infra*, section 1107 gives Chapter 11 debtors-in-possession all powers normally associated with trustees in the usual event that no trustee is appointed.

Committee, finding management's stance unreasonable, petitioned the bankruptcy court for permission to prosecute a § 544(b) avoidance action *in Cybergenics's name and on its behalf* — any recovery would go not to the Committee, but to the estate itself. The Bankruptcy Court concluded that the fraud claims were colorable, and that the Committee's offer to bear the litigation costs insulated the estate from risk. Noting that the debtor-in-possession has a duty to maximize the value of the estate, the court concluded that management's refusal to act was unreasonable even given the usual judicial deference to business judgment, and it authorized the Committee to sue in Cybergenics's name.

This difference in contexts is crucially important, for while the question in *Hartford Underwriters* was one of a *nontrustee's right* unilaterally to circumvent the Code's remedial scheme, the issue before us today concerns a *bankruptcy court's equitable power* to craft a remedy when the Code's envisioned scheme breaks down. With this perspective in mind, we turn to the question whether derivative suits may be maintained under § 544(b) after *Hartford Underwriters.*

### IV. Do Derivative Suits under § 544(b) Survive *Hartford Underwriters*?

**A. The Code Itself**

As did the Court in *Hartford Underwriters*, "we begin with the understanding that Congress says in a statute what it means and means in a statute what it says there." *Hartford Underwriters*, 530 U.S. at 6 (quoting *Connecticut Nat. Bank.*, 503 U.S. at 254). When "the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Id.* (citations omitted). Chinery and Lincolnshire ("Lincolnshire") contend that, as the same language is used in §§ 544(b) and 506(c), there is a presumption that it means the same thing in each instance: "Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners*

*& Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). That presumption may be overcome only when "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Id.* Lincolnshire therefore submits that the Committee's "burden of persuading us that the section must be read to allow its use by other parties is exceptionally heavy." *Hartford Underwriters*, 530 U.S. at 9 (citation omitted).

The Committee does not dispute this assessment — it concedes that, as in *Hartford Underwriters*, "the trustee may" cannot be read to mean "the trustee and other parties in interest may." But it submits that this point is neither here nor there, for it does not seek to "use" § 544(b) in that sense. In its estimation, § 544(b) is important only insofar as it does not *preclude the bankruptcy court* from authorizing the Committee to sue derivatively when the trustee, the party explicitly empowered to use § 544(b), improperly refuses to exercise its power. Of course, even under this view we must determine whether such an equitable remedy is consistent with the Bankruptcy Code's statutory scheme, of which § 544(b) is a part. We are satisfied that it is.

**1. The Need to Interpret Chapter 11 as a Whole**

As the Supreme Court has often noted, "[s]tatutory construction [ ] is a holistic endeavor," *United Savings Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988), and this is especially true of the Bankruptcy Code. In *United States v. Kelly*, a case interpreting § 523, the Court stated that "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." 479 U.S. 36, 43 (1986) (citations omitted). The *Hartford Underwriters* Court interpreted the Code holistically in determining that "the trustee may" in § 506(c) is exclusive, but in that case, there was no "whole law" to interpret, for § 506(c) is effectively self-contained. This is evident in two ways. First, there is no other provision in Chapter 7 of the Code that even arguably authorizes a party to "recover [administrative expenses] from property

securing an allowed secured claim," so the Court saw no need to look beyond § 506(c) to understand the mechanics of the cause of action. Second, the Court concluded that "the fact that the sole party named — the trustee — has a unique role in bankruptcy proceedings makes it entirely plausible that Congress would provide a power to him and not to others." *Hartford Underwriters*, 530 U.S. at 7. It therefore saw no reason to look beyond § 506(c) to determine standing to bring that cause of action.

In contrast, reading § 544(b) in isolation leads immediately to incoherence. While, as the Court explained, the trustee serves a "unique role" in Chapter 7, nothing could be further from the truth in Chapter 11, where trustees rarely exist. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule."); 7 *Collier on Bankruptcy* ¶ 1104.02[1] (15th rev. ed. 1998) (noting that appointment of a trustee in a Chapter 11 case is an "extraordinary" remedy). Reading § 544(b) alone would lead to the fatuous conclusion that Congress vested its cause of action exclusively in a party that usually does not exist. Only by looking beyond § 506(c) can one make sense of this situation, in that § 1107(a) gives a Chapter 11 debtor-in-possession (here, Cybergenics) the rights and powers of a trustee in the event that no trustee is appointed.

It is therefore clear that § 544(b) must be viewed as merely a part, albeit an important part, of the Chapter 11 framework that is designed to help debtors reorganize while continuing as viable concerns.[5] The Committee submits that, just as one must read § 1107(a) in conjunction with § 544(b) to understand who "the trustee" is for § 544(b) purposes, one must consider three other Chapter 11 sections — 1109(b), 1103(c)(5), and 503(b)(3)(B) — to

---

5. In this regard, the case at bar is the exception to the rule, for after filing under Chapter 11, Cybergenics decided to liquidate rather than reorganize. Critically, however, unlike the debtor in *Hartford Underwriters*, Cybergenics never converted its case from Chapter 11 to Chapter 7. Its bankruptcy therefore remains governed by the Chapter 11 "reorganization" rules.

determine whether derivative standing is a permissible equitable remedy in cases where the court determines that the trustee has unreasonably refused to bring an avoidance claim under § 544(b). These sections shed light on the role Congress intended creditors' committees to play in the reorganization process, and we will examine each in turn.

### 2. Section 1109(b)

Section 1109(b) provides that:

> A party in interest, including the debtor, the trustee, *a creditor's committee*, an equity security holder's committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under [Chapter 11].

11 U.S.C. § 1109(b) (emphasis added). The Committee submits that, "[a]lthough 1109 would not provide an independent right for the Committee to initiate a suit, absent bankruptcy court approval, it does support the authority of bankruptcy courts to permit creditors' committees to bring claims *on behalf of* the debtor in possession *for the benefit of the estate.*" (Committee's Reply Brief at 7.) There is precedent for this view. *Collier* explains that, "consistent with the broad right of participation conferred by § 1109(b), the court may authorize a party in interest to commence litigation on behalf of the estate if certain conditions are satisfied." 7 *Collier on Bankruptcy* ¶ 1109.05 (citing *Fogel v. Zell*, 221 F.3d 955, 965-66 (7th Cir. 2000)) ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee.").

Lincolnshire contends that, whatever the theoretical appeal of this position, it does not survive *Hartford Underwriters*, where Hartford argued "that § 1109(b) evidences the right of a nontrustee to recover under § 506(c)." *Hartford Underwriters*, 530 U.S. at 8. While noting that § 1109(b) was "by its terms inapplicable" because it applied only to Chapter 11 reorganizations, and the debtor had previously converted its case to Chapter 7, *id.*, the Court nonetheless stated in dictum that "we do not read

§ 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties." *Id. Cf.* 7 L. King, *Collier on Bankruptcy* ¶ 1109.05 (15th rev. ed. 1999) ("In general, section 1109 does not bestow any right to usurp the trustee's role as representative of the estate with respect to the initiation of certain types of litigation that belong exclusively to the estate."). In Lincolnshire's view, § 1109(b) allows a committee to intervene in an adversary proceeding initiated by a trustee, but it does not allow a committee to initiate or prosecute an action independent of the trustee.

The Committee responds that § 1109(b) must mean something more than a right to intervene, for "a general right to be heard would be an empty grant unless those who had such right were allowed to act when those who should act did not." (Committee's Brief at 26) (*quoting* 5 *Collier on Bankruptcy* § 1109.02[3] (15th ed. 1986)). It submits that we should not give great weight to the Supreme Court's interpretation in dictum of a provision that the Court itself noted was "by its terms inapplicable," especially since the Committee here does not assert an independent right of the sort the *Hartford Underwriters* Court considered.

Although the Committee is doubtless correct that the Supreme Court's dicta are not binding on us, we do not view it lightly. As we have stated:

> [W]e should not idly ignore considered statements the Supreme Court makes in dicta. The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket. "Appellate courts that dismiss these expressions [in dicta] and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there."

*In re McDonald*, 205 F.3d 606, 612-13 (3d Cir. 2000) (brackets in original) (quoting *United States v. Bloom*, 149

F.3d 649, 653 (7th Cir. 1998)). Nevertheless, we are satisfied that the case at bar is not the situation the Court's dictum anticipated. The Court's clear concern was that a party might use § 1109(b) to "usurp[ ] the trustee's role as representative of the estate," *Hartford Underwriters*, 530 U.S. at 8, thus defeating Congress's intention that the trustee act as a gatekeeper, weighing the potential benefits of litigation against the costs it might incur. No risk of usurpation exists here, for the Committee took no unsanctioned action. Instead, it petitioned the Bankruptcy Court for permission to sue in the estate's name, and that Court conferred such authority only after it determined that the debtor was neglecting its statutory duty to act in the estate's interest. This exercise of judicial power does not implicate the usurpation concerns expressed in *Hartford Underwriters*. Yet it is precisely because the issue at bar involves judicial power that § 1109(b) cannot, alone, provide a definitive resolution. Read fairly, § 1109(b) addresses only a committee's direct rights — it says nothing whatever about a *court's power* to allow derivative standing to remedy a violation of those rights.

Section 1109(b) is helpful to the Committee insofar as it evinces Congress's intent for creditors' committees to play a vibrant and central role in Chapter 11 adversarial proceedings. *Amicus* G. Eric Brunstad offers an etymological perspective on that intent. Section § 1109(b) derives from Section 206 of the former Bankruptcy Act, 11 U.S.C. § 606, and former Chapter X Rule 10-210(a). *See In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985). These two provisions were designed to broaden creditor participation in reorganization proceedings in order to remedy the deficiencies of prior procedures, which were deemed to be unduly restrictive. *See In re Marin Motor Oil, Inc.*, 689 F.2d 445, 451 (3d Cir. 1982). Significantly, however, § 1109(b) is broader than either of those provisions — while they authorized creditors "to be heard on all matters," neither authorized creditors to "raise" issues. Given our conclusion *infra* that derivative standing for creditors' committees was common in the pre-Code days of Section 206 and Chapter X Rule 10-210(a), it would be odd to conclude that Congress abolished derivative

standing at the same time as it broadened committees' adversarial role through § 1109(b).

### 3. Section 1103(c)(5)

The Committee next turns for support to Section 1103(c)(5), which states: "A committee appointed under section 1102 of this title may perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). Because the Bankruptcy Court found that the assertion of fraudulent transfer claims would benefit the estate, the Committee submits that it should be able to represent the estate for the purpose of prosecuting those claims.

Lincolnshire has several responses. It first represents that the Committee's interpretation of § 1103(c)(5) would amount to a free-roving power for the Committee to do whatever it considers to be in the estate's interest, a role that would eviscerate the debtor-in-possession's role as gatekeeper. It next notes that the powers granted to committees in § 1103(c)(1)-(4) are very specific, including the power to: (1) consult with the debtor concerning the case; (2) investigate the debtor's acts and financial condition; (3) participate in the formulation of a plan; and (4) request the appointment of a trustee or examiner. Linconshire suggests that interpreting the (c)(5) catch-all provision to allow committees to take any action in the debtor's interest would render superfluous the specific grants in (1) to (4), and would also violate the interpretive canon *ejusdem generis*, which states that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (quoting 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.17 (1991)). Insofar as the grants of power in (1) to (4) are quite narrow and non-adversarial, it concludes, the catch-all power should be similarly confined.

We agree that § 1103(c)(5) does not confer the sort of blanket authority necessary for the Committee independently to initiate an adversarial proceeding,

including one under § 544(b). Like § 1109(b), however, § 1103(c)(5) suggests that Congress intended for creditors' committees to perform services on behalf of the estate, and that Congress consciously built a measure of flexibility into the scope of those services. As the question before us today is whether a bankruptcy court can authorize a creditors' committee to represent the estate when the usual representative is delinquent, the "flexible representation" role evidenced in § 1103(c)(5) militates in the affirmative.

### 4. Section 503(b)(3)(B)

While Sections 1109(b) and 1103(c)(5) provide clear evidence that Congress envisioned a central role for creditors' committees in Chapter 11 proceedings, their focus on creditors' committees themselves provides at best indirect evidence that Congress granted bankruptcy courts the power to confer derivative standing upon those committees. A third Code section, however, provides far more direct insight into bankruptcy courts' powers. Section 503(b)(3)(B) allows for the priority payment of the expenses of "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B). Brunstad argues that the only explanation for this provision is that it rewards monetarily the practice of permitting creditors, with court authorization, to pursue causes of action on behalf of bankrupt debtors. It would make little sense, he urges, to provide for the reimbursement of a "creditor that recovers," if standing to recover is limited exclusively to the trustee — that interpretation would render § 503(b)(3)(B) entirely superfluous.

*Amicus* Official Committee of Unsecured Creditors of Safety-Kleen Corp. ("The Safety-Kleen Committee") agrees, and it provides an historical perspective on § 503(b)(3)(B). Derivative standing for creditors was recognized judicially as early as 1900. *See Chatfield v. O'Dwyer*, 101 Fed. 797, 799 (8th Cir. 1900); 3A James Wm. Moore et al., *Collier on Bankruptcy* ¶ 64.104 n.6 (14th ed. rev. 1975). In 1903, Congress allowed for reimbursement for such services by adding Section 64(a)(1) to the Bankruptcy Act of 1898:

> The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of

> bankruptcy estates, and the order of payments shall be: (1). . . where the property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, *is recovered for the benefit of the estate of the bankrupt by the efforts and at the cost and expense of one or more creditors*, the reasonable costs and expenses of such recovery. . .

11 U.S.C. § 104(a)(1) (redesignated from § 64 in 1938) (repealed 1978) (emphasis added). Courts interpreted § 64 as not only allowing for recovery of expenses incurred while suing derivatively, but also as authorizing derivative standing in the first instance. *See, e.g., In re Eureka Upholstering Co.*, 48 F.2d 95, 96 (2d Cir. 1931) (allowing the bankruptcy court to authorize derivative standing under § 64); *In re Stearns Salt & Lumber Co.*, 225 Fed. 1, 3 (6th Cir. 1915) (stating that a trustee could authorize derivative standing under § 64). A creditor's ability to sue derivatively was, however, limited by the requirement that a creditor obtain permission either from the trustee or the court before acting, the rationale being that those entities served a salutary gatekeeping function. *See, e.g., In re Eureka*, 48 F.2d at 96.

When Congress enacted the Bankruptcy Code in 1978, it made clear its intent for the new § 503(b)(3)(B) to continue the policies of § 64(a)(1) regarding the reimbursement of expenses incurred while recovering property for the benefit of the estate. *See* H.R. Doc. No. 93-137, 93d Cong. 1st Sess., Pts I and II (1973), *available in* Collier 15th ed. at App. Pt. 4(c) (explaining that the proposed § 503(b)(3)(B) "continues the policy of § 64(a)(1) and allows a creditor to recover expense incurred which actually benefits the estate"). The Safety-Kleen Committee submits that the only substantive modification contained in § 503(b)(3)(B) is a clarification that only the bankruptcy court — not the bankruptcy trustee — can authorize derivative suits. (Safety-Kleen Committee Brief at 16) (citing *In re Godon, Inc.*, 275 B.R. 555, 562 (Bankr. E.D. CA. 2002)).

Lincolnshire, however, strongly disputes the notion that § 503(b)(3)(B) authorizes derivative standing. It observes that "[f]ederal courts have consistently held that § 503(b)(3)(B) does not confer standing to creditors to sue

on behalf of the bankruptcy estate." (Lincolnshire's Response to *Amici* at 15-16) (quoting *Surf N Sun Apts., Inc., v. Dempsey*, 253 B.R. 490, 492 (M.D. Fla. 1999)) (citing cases). Lincolnshire instead contends that the provision merely allows the recovery of expenses incurred in actions that a creditor has a *direct* right to bring. For example, a creditor might assist a debtor in locating assets owed to the estate by conducting a Bankruptcy Rule 2004 examination of a transferee, a step available to "any party in interest" that obtains court approval. *See* Fed. R. Bankr. Proc. 2004. *Amicus* Professor Keith Sharfman agrees, and offers by way of example the situation where a creditor brings a state law fraudulent transfer claim against a party to whom the debtor had transferred the creditor's collateral. He submits that such an action would need "the court's approval," *i.e.*, the grant of a motion to lift the automatic stay that would otherwise block the action from proceeding. *See* 11 U.S.C. §§ 362(d) and 362(f). Any surplus value recovered would presumably be "for the benefit of the estate," as it would have to be turned over to the estate pursuant to 11 U.S.C. § 542.

Lincolnshire also asserts that, even if Section 503 does recognize derivative standing, it "does not address, even inferentially, the power of a creditors' committee. It addresses only the ability of a 'a creditor,' not 'a creditors' committee,' to recover certain expenses. Congress obviously knew the difference." (Lincolnshire Reply to *Amici* at 16.) For example, in § 1109(b), discussed at length *supra*, Congress granted the right to appear and be heard to a "party in interest, including the debtor, the trustee, *a creditors' committee*, an equity security holders' committee, [or] *a creditor*." 11 U.S.C. § 1109(b) (emphasis added). This contention is not merely semantic, for the Supreme Court presumes "that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994).

Although Lincolnshire's arguments are not without force, we conclude that the most natural reading of § 503(b)(3)(B) is that it recognizes and rewards monetarily the practice of permitting creditors' committees, with court authorization,

to pursue derivative actions. We are convinced that the provision is not limited to direct causes of action, for property recovered in a direct action is not recovered "for the benefit of the estate." The offered examples are not to the contrary. While a creditors' committee may certainly assist a debtor in locating property under Bankruptcy Rule 2004, that investigative assistance would not implicate § 503(b)(3)(B) because the committee would not itself *recover* the property. More promising is Professor Sharfman's suggestion of a creditor who independently pursues a state law fraud claim and relinquishes to the estate any surplus recovery. Yet this hypothetical fails as well, for no surplus recovery is possible. Relevant law provides that a transfer or obligation may be avoided only "to the extent necessary to satisfy the creditor's claim." *See* 7A Uniform Laws Annotated, Uniform Fraudulent Transfer Act § 8; 7A Uniform Laws Annotated, Uniform Fraudulent Conveyance Act § 9. Because an oversecured creditor cannot directly recover any property beyond that necessary to satisfy its own claim, it cannot recover property for the benefit of the estate unless it sues derivatively.

Generalizing from these examples, we "cannot conceive of a situation in which a creditor has independent standing which would allow it to pursue the recovery of property transferred or concealed by the debtor." *In re Blount*, 276 B.R. 753, 762 (Bankr. M.D. La. 2002). While it is possible that such a situation exists, we are at all events unwilling to interpret § 503(b)(3)(B) as anticipating obscure possibilities when a far more natural interpretation is apparent. Especially given the statutory history, we are satisfied that Congress intended § 503(b)(3)(B) to allow bankruptcy courts to reward derivative suits prosecuted by creditors' committees.[6]

---

6. The dissenting opinion suggests that because creditors' committees are typically represented by attorneys, their expenses are properly reimbursed under sections 330(a)(1)(A) and (B), rather than under section 503(b)(3)(B). Those sections provide for "reasonable compensation" as well as "reimbursement for actual, necessary expenses" incurred by a committee's representative, such as an attorney. 11 U.S.C. § 330(a)(1)(A), (B). Also, under this view, section 503 properly addresses only individual creditors, not creditors' committees.

Of course, that determination does little to help the Committee if only individual creditors may bring derivative actions. Lincolnshire is correct in its observation that § 503(b)(3)(B) speaks only of a "creditor . . . that recovers," and says nothing about creditors' committees. *Amicus* Brunstad submits that this is a mere technicality, for under section 102(7) of the Bankruptcy Act, "the singular includes the plural." He reasons that, if all of the creditors could simultaneously bring an identical action, there is no reason to disallow the simpler step of allowing a representative committee to bring that same action, especially given the flexible authority in § 1103(c)(5) for committees to "perform such other services as are in the interest of those represented." (Transcript of Oral Argument at 33.)

To be sure, several Code provisions identify both creditors and creditors' committees as parties with authority to take action, *see, e.g.,* § 1109(b), and this lends some weight to Linconshire's suggestion that the absence of "committees" in § 503(b)(3)(B) is meaningful. But we are realists, and we recognize that if we disallow the Committee's derivative suit but sanction derivative suits by individual creditors, the individual creditors could simply substitute themselves as plaintiffs under Fed. R. Civ. Proc. 17(a) and move forward with litigation. Forcing that step would be a make-work, for those individual cases would likely be consolidated into one substantively identical to

We do not believe that it would be proper to embark *sua sponte* on a lengthy analysis of Section 330(a)'s role in bankruptcy proceedings — that section was not cited in any brief submitted in this case. Suffice it to say that it is not obvious that section 330(a) displaces section 503(b)(3)(B) in this situation, as the two sections contain key differences. One difference is that section 330(a) does not provide compensation for a committee's expenses that are not incurred *by an attorney*, and such costs may be considerable. Another is that unlike section 503, section 330(a) contains no language limiting compensation to a creditor "that recovers," thus raising the specter of creditors' committees seeking reimbursement for *failed* attempts at recovery. As for the proposition that section 503 addresses only individual creditors, not creditors' committees, we set forth in the text *infra* our reasons for concluding otherwise.

that at bar. Given the flexible role of committees evidenced in § 1103(c)(5) and the Code's general presumption that the singular means the plural, we are satisfied that the purpose of § 503(b)(3)(B) is served by allowing the Committee to recover expenses incurred in pursuing a derivative suit. Any other result would render that provision superfluous, for absent a judicial power to authorize derivative suits by creditors, it makes no sense to speak of rewarding a creditor who sues, with court permission, to recover property for the benefit of the estate.

## 5. A Textual Conclusion

For all of the foregoing reasons, we are satisfied that the most natural reading of the Code is that Congress recognized and approved of derivative standing for creditors' committees. Sections 1109(b) and 1103(c)(5), taken together, evince a Congressional intent for committees to play a robust and flexible role in representing the bankruptcy estate, even in adversarial proceedings. Several cases decided after *Hartford Underwriters* have concluded that these two sections alone are sufficient to confer upon creditors' committees the right to sue derivatively. In *In re Commodore Int'l Ltd.*, 262 F.3d 96 (2d Cir. 2001), the Second Circuit outlined its requirements for derivative standing, stating:

> [W]e hold that a creditors' committee may sue on behalf of the debtors, with the approval and supervision of a bankruptcy court, not only where the debtor in possession unreasonably fails to bring suit on its claims, but also where the trustee or the debtor in possession consents.

*Id.* at 100. Lincolnshire submits that *Commodore* "has no bearing on the present issue with regard to standing because neither that Court nor the lower court even acknowledged the [*Hartford Underwriters*] decision." (Lincolnshire Brief at 29.) The implication is that the Second Circuit Court of Appeals, and the parties before it, somehow failed to notice an on-point Supreme Court decision issued less than a year earlier. We doubt that explanation; more plausible is that the Second Circuit thought *Hartford Underwriters* to be irrelevant insofar as it

did not address — indeed, it eschewed — derivative standing. Any doubt on that score is erased by the Second Circuit's subsequent decision in *Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)*, 303 F.3d 161 (2d Cir. 2002). There, the Court mentioned *Hartford Underwriters* after stating its belief that Sections 1103(c)(5) and 1109(b) "impl[y] a qualified right for creditors' committees to initiate adversary proceedings where the trustee or debtor in possession unjustifiably failed to bring suit." *Id.* at 166 (citing *In re STN Enterprises*, 779 F.2d 901, 904 (2d Cir. 1985)). The Second Circuit clearly believes that Sections 1103(c)(5) and 1109(b) authorize derivative standing even after *Hartford Underwriters*.

The Seventh Circuit reached a similar decision in *Fogel*, 221 F.3d at 955, a post-*Hartford Underwiters* case in which it stated that:

> If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee. . . . In such a suit, the creditor corresponds to the shareholder, and the trustee to management, in a shareholder derivative action.

*Id.* at 966 (citations omitted). Again, although *Fogel* does not mention *Hartford Underwriters*, we doubt that it escaped the court's notice.

At all events, after an exhaustive examination of *Hartford Underwriters*, we agree with the Second and Seventh Circuits, except insofar as the Second Circuit in *Term Loan* implied that the power to initiate derivative suits flows entirely from Sections 1103(c)(5) and 1109(b). We do not read those two sections so broadly, but when they are paired with § 503(b)(3)(B), it becomes unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate. Avoiding fraudulent transfers through § 544(b) is a perfect application of that function.

Yet a piece of the puzzle is missing. The Code clearly demonstrates that Congress approved of derivative standing, but none of the three sections discussed —

1109(b), 1103(c)(5), or 503(b)(3)(B) — seems directly to *authorize* such standing. Section 503 comes closest, but read fairly, that provision merely empowers bankruptcy courts to reimburse creditors' committees for the expenses they incur while suing derivatively. It does not authorize derivative actions in the first instance. To be sure, that section would be meaningless unless authority existed, but such reasoning by negative implication is less than satisfying. We believe that the missing link is supplied by bankruptcy courts' equitable power to craft flexible remedies in situations where the Code's causes of action fail to achieve their intended purpose.

## B. Bankruptcy Courts as Courts of Equity

The Supreme Court has long recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934) ("[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."). The enactment of the Code in 1978 increased the degree of regulation Congress imposed upon bankruptcy proceedings, but it did not alter bankruptcy courts' fundamental nature. *See* H.R. Rep. No. 95-595, at 359 (1977), *reprinted in* U.S.C.C.A.N. 5963, 6315 (stating that, under the Bankruptcy Code, "[t]he bankruptcy court will remain a court of equity") (citing *Local Loan Co.*, 292 U.S. at 240). Any lingering doubt on that point is dispelled by a string of post-enactment Supreme Court decisions — *see Young v. United States*, 543 U.S. 43, 50 (2002) ("[B]ankruptcy courts [ ] are courts of equity and 'apply the principles and rules of equity jurisprudence.' ") (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939)); *United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.") — and by the Code itself. *See* 11 U.S.C. § 105(a) ("The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary

or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.").

The concept of derivative standing arose when, despite a lack of express statutory authorization, courts of equity allowed shareholders to pursue valuable actions when the nominal plaintiff (the corporation) unreasonably refused to do so. *See generally* Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on Its Derivation*, 32 N.Y.U. L. Rev. 980 (1957) (tracing the historical development of derivative suits). In *Ross v. Bernhard*, 396 U.S. 531 (1970), the Supreme Court explained the utility of derivative standing as a means of providing equitable redress, not only from "faithless officers and directors," but also directly from "third parties who had damaged or threatened the corporate properties and whom the corporation through its managers refused to pursue." 396 U.S. at 534. It also addressed the doctrine's standards, including the requirement "that the corporation itself [must have] refused to proceed after suitable demand, unless excused by extraordinary conditions." 396 U.S. at 534.

We believe that the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers. In § 544(b), Congress made clear that it intended for the estate to recover property fraudulently transferred by the debtor. The mechanism Congress designed to ensure this recovery was to vest in the trustee (or the debtor-in-possession) both the power to bring an avoidance action and the duty to bring one if it would likely benefit the estate. *See, e.g., In re Cybergenics*, 226 F.3d at 243 ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors."). Congress clearly envisioned that the trustee or debtor would avoid fraudulent transfers, thus maximizing the value of the estate and allowing creditors to recover their claims from that estate.

The problem at bar is that the intended system broke down. The debtor refused to bring an action that the Bankruptcy Court found would benefit the estate, and thereby violated its fiduciary duty to maximize the estate's value. It is in precisely this situation that bankruptcy

courts' equitable powers are most valuable, for the courts are able to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain. As the Supreme Court has noted, "[e]quity eschews mechanical rules; it depends on flexibility," *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946), and "there is inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) (quoting *Clark v. Smith*, 13 Pet. 195, 203 (1839)).

The policy concern evident in § 544(b) is the need to channel avoidance actions through the trustee, who acts as a gatekeeper and prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors. The Supreme Court stated as much in *Hartford Underwriters* when it expressed concern about parties "usurp[ing] the trustee's role as representative of the estate." 530 U.S. at 8-9. This representative role explains why § 544(b) allows the trustee, but not a creditors' committee, to bring an avoidance action on its own authority, *i.e.*, without court permission. But that provision does not foreclose a bankruptcy court's equitable power to substitute *itself* as gatekeeper when the trustee is delinquent, and to allow a creditors' committee to pursue an avoidance action *for the estate's direct benefit* rather than its own. The end result of this equitable remedy — the estate's recovery of fraudulently transferred property — is precisely what Congress envisioned, and Code Sections 1109(b), 1103(c)(5), and 503(b)(3)(B) anticipate the court's means of achieving that result.

We are therefore satisfied that the Bankruptcy Court acted within its power in conferring derivative standing upon the Committee. As further evidence that its decision was provident, however, we observe that there is a lengthy history of bankruptcy courts conferring derivative standing in analogous situations.

## V. Pre-Code Practice

In *Hartford Underwriters*, Hartford urged that administrative claimants have a right to bring direct actions

under § 506(c). As evidence of this power, it cited a string of cases purporting to demonstrate that such actions were common in the years before the Bankruptcy Code, and noted the Supreme Court's declaration that, "[w]hen Congress amends the bankruptcy laws, it does not write 'on a clean slate.'" *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992). *See Cohen v. De La Cruz*, 523 U.S. 213, 221 (1998) ("We [] will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.") (citations omitted). *See also Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986) (relying on clear pre-Code practice). After surveying Hartford's cases, however, the Court concluded that:

> It is questionable whether these precedents establish a bankruptcy practice sufficiently widespread and well recognized to justify the conclusion of implicit adoption by the Code. We have no confidence that the allowance of recovery from collateral by nontrustees is the type of rule that . . . Congress was aware of when enacting the Code.

*Hartford Underwriters*, 530 U.S. at 9 (quoting *Ron Pair Enterprises, Inc.*, 489 U.S. at 246). It also explained that, at all events, the text of § 506(c) was so clear as to "leave[ ] no room for clarification by pre-Code practice." *Id.* at 10.

Compared to the evidence offered in *Hartford Underwriters*, the pre-Code tradition of allowing courts to confer derivative standing upon creditors is compelling. Indeed, it is precisely the sort of practice of which Congress would have been aware when drafting the Code. Of course, as was true in *Hartford Underwriters*, even the most compelling pre-Code practice cannot overcome clear text, but we do not look to it for that purpose — as explained *supra*, we believe that the most natural reading of the Code itself is that it allows bankruptcy courts equitably to confer derivative standing on creditors in this situation. While that favorable text is alone sufficient, we believe that it is instructive to explore the prevalence of derivative standing in pre-Code years, for it confirms that the Bankruptcy Court's decision was not only proper, but also prudent.

The concept of derivative standing was first applied in the bankruptcy context in the case of *Chatfield v. O'Dwyer*, 101 Fed. 797 (8th Cir. 1900), where the Eighth Circuit explained:

> [W]e recognize the right of a creditor to apply to the bankrupt[cy] court for an order permitting him to prosecute an appeal in the name of the trustee, when he has called upon the trustee to take an appeal from the allowance of a claim against the bankrupt's estate, and the latter has declined to appeal. As the trustee is an officer of the bankrupt[cy] court, and subject to its orders, that court has an undoubted power either to direct the trustee to appeal when it entertains doubts of the verity of its judgment, or to make an order permitting a creditor who so desires to appeal from the allowance in the name of the trustee when the latter declines to appeal.

*Id.* at 800. In 1915, the Sixth Circuit recognized a trustee's power to confer derivative standing upon creditors, *see In re Stearns Salt & Lumber Co.*, 225 Fed. 1, 3 (6th Cir. 1915), and in 1931, the Second Circuit recognized the bankruptcy court's power to do so. *See In re Eureka Upholstering Co.*, 48 F.2d 95 (2d Cir. 1931). As Judge Hand explained:

> The receiver is responsible for the collection of the assets . . . and he alone can authorize any charges against them. If any creditor, petitioning or other, learns facts which lead him to suppose that property has been concealed, he may, and indeed he should, advise the receiver, and *if the receiver prove slack, he may apply to the referee [the bankruptcy judge] to stir him to action. The referee or the [district] judge may then authorize the creditor to proceed*, and he will be entitled to his reward under [§ 64], but not otherwise.

*Id.* at 96. Cases adhering to this view are legion, and we set forth further examples in the margin.[7]

---

7. *See Ohio Valley Bank Co. v.* Mack, 163 Fed. 155, 156 (6th Cir. 1906) ("[W]hen the trustee refuses to appeal . . . the better practice would be to order the trustee to appeal or to allow the dissatisfied creditor to appeal in his name."); *In re Roadarmour*, 177 Fed. 379, 381 (6th Cir.

We also place great weight on the fact that the 1978 version of the authoritative *Collier on Bankruptcy*, in summarizing practice under the pre-Code Bankruptcy Act, references in six different volumes creditors' ability to obtain court permission to pursue actions on behalf of the estate. *See* 4B *Collier on Bankruptcy* (14th ed. 1978) ¶ 70.92 ("If the creditors then believe that a suit or other proper proceeding should be commenced for avoidance or recovery, they have the right to petition the bankruptcy court wherein the proceedings are pending for an order compelling the trustee to act, or for leave to prosecute the suit in the name of the trustee and on behalf of the estate."); 3 *Collier on Bankruptcy* (14th ed. 1978) ¶ 60.57[2] ("The right of creditors to maintain an action for the

1910) ("[W]here the trustee in bankruptcy refuses to appeal . . such court may, in its discretion, allow an appeal to be taken by creditors."); *In re Patterson-MacDonald Shipbuilding Co.*, 288 Fed. 546, 548 (9th Cir. 1923) (same)*; In re Flanders*, 32 F.2d 654, 655 (6th Cir. 1929) (same); *Fred Reuping Leather Co. v. Fort Greene National Bank of Brooklyn*, 102 F.2d 372, 373 (3d Cir. 1939) (same); *Gochenour v. Cleveland Terminals Bldg. Co.*, 118 F.2d 89, 95 (6th Cir. 1941) (if the court deems proper, it can give creditors the right to bring suit in the name of the debtor); *Rooke v. Reliable*, 195 F.2d 667, 668 (4th Cir. 1952) (noting the well-established rule that a general creditor has no right to contest another creditor's claim or to appeal from the refusal of the court to disallow it unless, upon application, the trustee has refused to do so and the district court has authorized the creditor to proceed in the trustee's name); *Dallas Cabana, Inc. v. Hyatt Corp.*, 441 F.2d 865, 868 (5th Cir. 1971) (if the trustee or debtor-in-possession refuses to bring an action, creditors have the right to ask leave of the court to prosecute the action for and in the name of the trustee or debtor-in-possession); *Casey v. Baker*, 212 F. 247, 254 (N.D.N.Y. 1914) (same); *In re Cook's Motors, Inc.*, 52 F. Supp. 1007, 1009 (D. Mass. 1943) (allowing recovery of expenses for any party that "acts in the place of the trustee in bankruptcy and not merely for his individual interest"), *rev'd on other grounds*, 142 F.2d 369 (1st Cir. 1944) (granting a creditor compensation under Section 64(a)(1) for justifiably and successfully acting in the place of the trustee in bankruptcy and for the benefit of the estate); *In re Macloskey*, 66 F. Supp. 610, 612 (D.N.J. 1946) (after the trustee declines to bring suit, the court can compel the trustee to proceed or allow the creditor to sue if the suit is maintained in the name of the trustee and by the order of the court).

recovery of a preference prior to the appointment of a trustee is impliedly recognized in § 64a(1) of the Act."); 4 *Collier on Bankruptcy* (14th ed. 1978) ¶ 67.48[2] ("If the creditor is permitted to act in the name of the trustee, it will be noted that the trustee, in whom the right . . . vests under the Act, will be plaintiff . . . and any recovery would inure to the estate. In the case of recovery this would be a proper situation for the application of § 64a(1)."); 2A *Collier on Bankruptcy* (14th ed. 1978) ¶ 47.03 ("If the trustee fails to do his duty, any interested creditor may make demand on him for appropriate action, and if he fails to act promptly, the creditor may, with permission of the court, act on behalf of the estate and in the name of the trustee."); 3A *Collier on Bankruptcy* (14th ed. 1978) ¶ 64.104 ("After appointment of a trustee, a condition upon the creditor's right to sue and receive reimbursement therefor is an application to him or to the court. Until the trustee's appointment, however, and in the absence of a receiver — or if the trustee has refused or is unable to act — this provision entitles creditors to initiate proceedings without any condition precedent."); 13 *Collier on Bankruptcy* (14th ed. 1978) ¶ 610.09 ("Creditors may ask the court to compel the trustee to act, or for leave to prosecute the action in the trustee's name."). *Collier*'s view is persuasive on such matters, for the Supreme Court has itself cited to it as evidence that a particular practice was "widely accepted" under the Bankruptcy Act. *See Kelly*, 479 U.S. at 46 (determining that criminal penalties under the Act were non-dischargeable).

*Amicus* Professor Keith Sharfman submits, however, that later pre-Code caselaw rejected derivative standing for creditors. For example, in *Klebanow v. New York Produce Exchange*, the court held that limited partners of a bankruptcy debtor are more like shareholders, who may maintain derivative suits, than like "mere creditors," who may not sue derivatively. 344 F.2d 294, 297 (2d Cir. 1965). Given the dictum in that case, Professor Sharfman contends that "it would be inaccurate to suggest that the Bankruptcy Code was enacted in an environment where derivative standing was a well-established norm." (Sharfman Brief at 9.) Interestingly, however, in 1985, the Second Circuit in *In re STN Enterprises* cited pre-Code

practice in recognizing the qualified right of creditors' committees to initiate avoidance suits, with the approval of the bankruptcy court, when the trustee or debtor-in-possession unjustifiably failed to bring suit to avoid a transfer. *In re STN Enterprises*, 779 F.2d at 904. *See also Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 105 F.3d 822 (2d Cir. 1997). If the Second Circuit meant what it said in dictum in *Klebanow*, it changed its mind thereafter.

At all events, complete doctrinal uniformity in caselaw is hardly to be expected where powers of equity are concerned. Especially given *Collier*'s sense of the law, we are satisfied that the overwhelming balance of pre-Code opinion supports courts' power to confer derivative standing upon creditors. *See Midlantic Nat'l Bank,* 474 U.S. at 500-01 (finding that three cases constituted "clear" pre-Code practice.) The historical record here is far more compelling than it was in *Hartford Underwriters*, a relatively easy case in which, at most, the cases supporting Hartford's ability to sue under § 506(c) slightly outnumbered those rejecting that ability. Therefore, to the extent that we do "not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure," *Cohen*, 523 U.S. at 221 (1998), we believe a presumption exists in favor of courts' power to confer derivative standing in this instance.

Our decision today, however, does not depend on this presumption, for the Code itself anticipates the existence of derivative standing. We believe that the historical acceptance of derivative standing is most valuable for the accumulated experience it evidences, *i.e.*, that derivative standing is a prudent way for bankruptcy courts to remedy lapses in a trustee's execution of its fiduciary duty. The Bankruptcy Court's decision in this case is in perfect harmony with that received wisdom.

## VI. Does Derivative Standing for Creditors' Committees Advance Congress's Goals?

Lincolnshire submits that the Bankruptcy Code provides many explicit remedies for situations where, as here, a

debtor unreasonably refuses to pursue an action on behalf of the estate. Its implication is that, by providing bankruptcy courts with a range of remedies, Congress intended for that range to be comprehensive, and it notes that it is not for courts to substitute their policy judgment for Congress's. *See Hartford Underwriters*, 530 U.S. at 13-14 ("[W]e do not sit to assess the relative merits of different approaches to various bankruptcy problems. . . . Achieving a better policy outcome — if what petitioner urges is that — is a task for Congress, not the courts."). We agree, at least insofar as policy rationales cannot override contrary text. But as explained *supra*, there is no text to override because the Code itself anticipates derivative standing.

The critical question is thus whether bankruptcy courts' equitable powers are sufficient to allow them to confer the derivative standing that the Code anticipates. For the reasons set forth above, we believe that they are. Indeed, the very fact that equitable powers are at issue renders public policy concerns more important than they were in *Hartford Underwriters*, for as the Supreme Court has said, "there is inherent in the Courts of Equity a jurisdiction *to . . . give effect to the policy of the legislature.*" *Mitchell,* 361 U.S. at 292 (emphasis added). *See also* 11 U.S.C. § 105(a) (empowering a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"). Put another way, although we concluded above that bankruptcy courts have equitable power to confer derivative standing upon creditors' committees to avoid fraudulent transfers in this situation, it is important to support that conclusion by assessing the public policy concerns underpinning Chapter 11.

Despite the existence of other potential remedies, we are satisfied that derivative standing in this instance achieves Congress's policy goals. We will proceed first by exploring those goals, and then by assessing the adequacy of the other remedies Lincolnshire identifies.

**A. The Salutary Effects of Derivative Standing for Creditors' Committees**

Before bankruptcy, a debtor's management and its most powerful creditors typically try to "work out" the debtor's

financial distress. In this process, managers frequently experience pressure to take extreme measures to protect the company. (Brief of *Amicus* Law Professors at 9.) They may make extraordinary concessions to providers of critical services, such as granting new liens on unencumbered property, agreeing to an excessive rate of interest, committing to lavish retention bonuses, or doing virtually anything else to avoiding filing for bankruptcy. *See, e.g.*, Eduardo Porter & Mitchell Pacelle, *Judge Increases Severance Pay to Former Enron Employees*, Wall St. J., Aug. 29, 2002, at A3 (discussing multi-million dollar retention bonuses paid by Enron insiders before bankruptcy). Whether or not these radical actions are ultimately successful, they often reduce the assets available to the debtor's creditors.

The Bankruptcy Code's avoidance powers are intended, *inter alia*, to deter this kind of managerial overreaching and to encourage creditors to allow a debtor a measure of breathing room. *See* H.R. Rep. No. 95-595, at 177 (1977) ("By permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during [its] slide into bankruptcy."). Fraudulent avoidance actions, such as those provided for in § 544(b), are intended to afford unsecured creditors peace of mind, for those creditors are usually the principal victims of managerial misfeasance.

Although fraudulent transfers are of concern in many chapters of the Bankruptcy Code, including in Chapter 7 liquidations, they present a particularly vexing problem in reorganizations conducted under Chapter 11. The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern. This explains why trustees are a fixture in Chapter 7 liquidations, but they are exceptional in Chapter 11 — it is thought that a debtor's existing management will be more familiar with the company than would be a court-appointed trustee, and that it would therefore be better able to guide the debtor back into solvency. *See Sharon Steel Corp.*, 871 F.2d at 1226 ("It is settled that appointment of a trustee should be the exception, rather than the rule."); 7 *Collier on Bankruptcy*

¶ 1104.02[1] (15th rev. ed. 1998) (noting that appointment of a trustee in a Chapter 11 case is an "extraordinary" remedy). In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, *i.e.*, the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.

This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor — really, the debtor's management — bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it. *See, e.g., Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988). For that reason, courts and commentators have acknowledged that the debtor-in-possession "often acts under the influence of conflicts of interest." *Canadian Pa. Forest Prod. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1441 (6th Cir. 1995). These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging. *Id.* at 1439. Finally, even if a bankrupt debtor is willing to bring an avoidance action, it might be too financially weakened to advocate vigorously for itself. In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.

The possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions. *Amicus* Law Professors explain that parties to bankruptcy workouts are typically sophisticated, and that they understand that their actions will likely be scrutinized after the fact. (Law Professors' Brief at 10.) They also understand that, even though a debtor's management may be reluctant to pursue an avoidance action, a creditors' committee will not be so hesitant. Therefore, the

mere threat of a creditors' committee suit is often a potent deterrent to overreaching by creditors and insiders. *See In re W. Pac. Airlines, Inc.*, 219 B.R. 575, 577-78 (Bankr. D. Colo. 1998) (discussing a creditors' committee's "watchdog" role). This deterrent effect remains important even after commencement of the bankruptcy case itself.[8]

## B. Potential Drawbacks of Derivative Standing for Creditors' Committees

### 1. Might derivative suits dissipate the value of the estate?

Despite these clear benefits stemming from derivative standing, *amicus* Professor Sharfman identifies reasons

---

8. Large corporate debtors routinely seek so-called "first-day" orders, in which they ask the bankruptcy court to approve such urgent matters as key-employee retention plans, the payment of pre-petition claims of critical vendors, and, most important, going-forward financing for the case. (Law Professors' Brief at 11.) The parties affected by these orders (*e.g.*, the key employees, critical vendors and lenders) often demand that the debtor waive other claims that it might have against them, such as avoidance actions. Post-petition financing orders in particular can present difficult problems for bankruptcy courts because they are extremely complex, often including provisions that cross-collateralize or "white wash" prepetition security interests. *See* David Kurtz & Rena Samole, *Bankruptcy Law & Practice Update: New Developments in an Uncertain Economy: A Satellite Program, First Day Orders*, at 2 (PLI Commercial Law Practice Course Handbook Series No. A0-00, 2001). Similarly, major vendors will often demand that the debtor release preference or comparable claims as the *quid pro quo* for doing business with the debtor.

A court facing motions for first-day orders has a difficult choice. If it disapproves of the order, it could simply refuse to issue it on the theory that the parties would renegotiate and eliminate any offending provisions. Alternatively, it could table the motion and explore the claim's underlying merits. But either choice is problematic, for first-day orders are by their nature extremely urgent — without an order approving financing for critical vendors, for example, the debtor might collapse before reorganization can occur. The possibility of a derivative suit by a creditors' committee serves Congress's goals when, by granting fist-day orders, bankruptcy courts nevertheless reserve to the creditors' committees the right to investigate and pursue claims that would otherwise be released in those orders. (Law Professors' Brief at 13.).

why it might be harmful from a policy perspective. He first argues that, although the purpose of derivative suits is presumably to maximize the value of the estate, academic research has shown that such suits frequently result in awards only large enough to pay the litigants' legal bills. *See* Roberta Romano, *The Shareholder Suit: Litigation Without Foundation?*, 7 Journal of Law, Economics and Organization 55 (1991); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L. Rev. 1 (1991). Sharfman submits that creditors' derivative suits are even less likely to add value than are shareholders' derivative suits, for the possibility of setting aside transfers as fraudulent would make it riskier for financially distressed firms to persuade potential lenders and suppliers to do business. (Sharfman Brief at 14.) The Supreme Court recognized this concern in *Hartford Underwriters*, where it stated that "[t]he possibility of being targeted . . . by various administrative claimants could make secured creditors less willing to provide postpetition financing." 530 U.S. at 13.

We are untroubled by this argument. To be sure, there are situations where derivative suits recover only enough to pay the lawyers, but that concern is lessened by the need to obtain bankruptcy court approval before pursuing an action. There is no inherent reason why a debtor would be able to prosecute an avoidance claim more cheaply than a creditors' committee could, so there is no reason why a creditor suing derivatively would dissipate more value than would a debtor suing directly. Likewise, although the possibility of an avoidance action might trouble a prospective supplier or lender, that is an argument not against derivative standing, but against avoidance actions generally. Congress, however, has clearly decided that such actions are valuable to the Chapter 11 process, and we will not second-guess that judgment. The concern that derivative suits might be "value-dissipating" is adequately served by affording a debtor the deference normally accorded pursuant to the business judgment rule. When a debtor's action is beyond the scope of that deference, however, Congress's intent is best served by ensuring that an action is filed, even if by a creditors' committee. At all

events, the Bankruptcy Court in this case concluded that the estate *ought* to have brought the avoidance claim in question.

## 2. Might bankruptcy courts be unable to identify meritorious claims?

Professor Sharfman also takes issue with the idea that a bankruptcy court can serve as a competent gatekeeper for the purpose of deciding when to authorize derivative standing. He submits that the idea that "judges in bankruptcy cases will permit only value enhancing derivative litigation to go forward (rather than all litigation that is merely colorable) is more wishful thinking than serious argument. It is often hard to tell at the outset when permission to prosecute derivative litigation is sought whether a claim is meritorious, and judges understandably can make mistakes." (Sharfman Brief at 15) (citing Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 102 (1991)). From this observation, he concludes that "creditors could well recover more in the aggregate if creditor derivative suits were impermissible across the board." (*Id.* at 16.)

It is doubtless true that judges, like trustees or debtors, sometimes lack sufficient information to determine *ex ante* whether a claim is value-enhancing or merely colorable. But it does not follow that creditors would likely recover more if derivative suits were impermissible. First, this assumes that the debtor-in-possession would be better able to identify valuable claims than a bankruptcy court would be. There is no reason this should be true, for, as discussed above, conflicts of interest can often cloud debtors' judgment — it is difficult objectively to determine whether a potential action is meritorious when one would be a defendant in that action.

Second, this argument assumes that creditors' committees are rather unsophisticated, for it predicts that the estate, and hence its creditors, would be better off if no avoidance actions took place. If that were true, presumably creditors' committees would know it, and would not seek to bring the sort of action at issue today. Third, this critique overlooks the fact that the choice at hand is not between

derivative actions and no actions. Instead, if a bankruptcy court cannot authorize a derivative suit when it concludes that a debtor is unreasonably refusing to pursue an action, it will likely take the alternative step of ordering the debtor itself to pursue that action. That step is unlikely to yield a vigorous prosecution of the claim, yet it would incur all of the costs of a derivative suit.

Most fundamentally, however, the problem with the "courts cannot identify meritorious claims" critique is that it is one of futility. The proposition that a bankruptcy court cannot reliably determine when a debtor is not maximizing value is, at bottom, an argument that bankruptcy courts are not capable of doing many of the things we depend on them to do. They are, for example, instrumental in approving the bankruptcy plan itself and determining whether to appoint an examiner or trustee, and they are frequently called upon to weigh the merits of proposed first-day orders. It seems to us that we have no choice but to presume the competency of bankruptcy courts throughout the process, and we are therefore unwilling to place much stock in the claim that they are unable to determine when a debtor is unreasonably refusing to pursue an avoidance action.

### 3. Might derivative suits consume judicial resources?

Lastly, *amicus* Professor Sharfman warns that determining whether a derivative suit should be maintained and, if so, who should maintain it, takes time and effort on the part of the court. The Court in *Hartford Underwriters* was concerned about this cost, observing that "the possibility of multiple [ ] claimants" created by "[a]llowing recovery to be sought at the behest of parties other than the trustee could [ ] impair the ability of the bankruptcy court to coordinate proceedings, as well as the trustee to manage the estate." 530 U.S. at 12-13. Professor Sharfman points out that in the case at bar, the issue of whether the Committee could pursue a derivative claim consumed significant judicial time and effort that would not have been necessary if creditors lacked derivative standing. We disagree. Rather, we believe that the cost that Sharfman laments arises from uncertainty regarding the propriety of derivative suits, a matter resolved by this appeal. If

derivative standing is unambiguously permissible, it is not unduly burdensome to determine whether any particular creditor or committee should have that standing.

In general, although we agree that derivative standing does not come without costs, we are satisfied that on the whole it is an immensely valuable tool for bankruptcy courts and creditors alike. It helps to deter fraudulent transfers in the first instance, and it provides courts with a viable remedy when those transfers nonetheless occur.

## C. Possible Substitutes for Derivative Standing for Creditors' Committees

Lincolnshire does not deny that derivative standing for creditors' committees is potentially beneficial, but it contends that such standing is not as critical as the Committee suggests because bankruptcy courts, and committees themselves, have many other remedies available. We explore these in turn.

### 1. Appointment of a bankruptcy trustee

Lincolnshire first argues that, although the usual Chapter 11 case proceeds without a bankruptcy trustee, a creditors' committee can move to appoint one pursuant to § 1104. That provision allows any "party in interest" (including a creditors' committee) to request appointment of a trustee "for cause," or if the appointment would be "in the interests of creditors." 11 U.S.C. § 1104(a). "Cause" to appoint a trustee may include "fraud, dishonesty, incompetence, or gross mismanagement . . . either before or after commencement of the case." *Id.* § 1104(a)(1). Lincolnshire posits that a trustee's independent nature would allow it to pursue avoidance claims without the conflicts of interest that can affect debtors-in-possession.

*Amici* Law Professors aptly respond that disallowing derivative suits and forcing creditors' committees to move to appoint trustees would amount to "replac[ing] the scalpel of derivative suit with a chainsaw." (Law Professors' Brief at 13.) Appointing a trustee in a Chapter 11 case is an "extraordinary" remedy, 7 *Collier on Bankruptcy* ¶ 11402[1] (15th rev. ed. 1998), and there is a corresponding "strong presumption" that the debtor should be permitted to

remain in possession. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1991). The problem is that appointing a trustee amounts to replacing much of a debtor's high-level management, and that creates immense costs in two ways. First, there is a statutory fee (which can be substantial) to which trustees are entitled for their services. *See* 11 U.S.C. §§ 326(a) (setting forth fee schedule), 330(a) (setting forth trustee's right to compensation); *cf.* 11 U.S.C. § 1107(a) (providing that debtors-in-possession are not entitled to statutory trustee's fees).[9] More important, however, is the cost implicit in replacing current management with a team that is less familiar with the debtor specifically and its market generally. The idea that existing management is best positioned to rescue a debtor from bankruptcy is precisely the reason why the appointment of a trustee is exceptional in Chapter 11 reorganizations, but occurs immediately in Chapter 7 liquidations. *See* Kenneth N. Klee & K. John Shaffer, *Creditors' Committees Under Chapter 11 of the Bankruptcy Code*, 44 S.C. L. Rev. 995, 1045, 1049 (1993) (observing generally that "the incremental costs" of a trustee usually "outweigh[ ] the benefits," and that "maximization of value rarely lies down this path.").

In short, we believe that appointing a trustee is too drastic a step to constitute a serious alternative to allowing derivative suits by creditors' committees. Indeed, because much of Chapter 11 is premised on allowing current management to remain in control of the debtor, it is unlikely that Congress intended to force a court to displace that management in the relatively commonplace event that a debtor makes a questionable decision not to prosecute a fraudulent avoidance claim.

### 2. Appointment of an examiner with authority to sue

*Amicus* Smurfit-Stone Corporation submits that, if appointing a trustee is too radical an alternative, a creditors' committee might instead move the court to

---

9. Of course, even a creditors' committee suing derivatively is entitled to recover its costs pursuant to § 503(b)(3)(B), discussed *supra*. But unlike a trustee, a creditors' committee is not entitled to a statutory fee in addition to those expenses.

appint an examiner under § 1104(c). That provision states that "a party in interest" may request the appointment of an examiner "to conduct such an investigation of the debtor as is appropriate," and that the court may order an appointment after notice and a hearing. An examiner's duties include investigation of the debtor, the debtor's business, and "any other matter relevant to the case or to the formation of a plan. *See* § 1106(b). Smurfit-Stone observes that a debtor's management remains in place when an examiner is appointed. Perhaps most important, however, is the fact that an examiner has all "of the duties of a trustee that the court orders the debtor in possession not to perform." 11 U.S.C. § 1106(b). At least one court has interpreted this language to mean that an examiner may initiate and pursue causes of action on behalf of the debtor. *See In re Carnegie International Corp.*, 51 B.R. 252, 256 (Bankr. S.D. Ind. 1984).

Although this alternative is less drastic than the appointment of a trustee, we nevertheless harbor doubts about its ability to substitute for derivative suit. One concern is that, like a trustee, an examiner would incur direct costs through its fees, so to that extent this remedy is inferior to the alternative of derivative suit by a creditors' committee. The more serious problem, however, is that it is less than obvious that § 1106(b) actually *does* permit examiners to initiate actions on the debtor's behalf. The full text of that section states:

> An examiner appointed under section 1104(d) of this title shall perform the duties specified in paragraphs (3) and (4) of subsection (a) of this section, and, except to the extent that the court orders otherwise, any other duties of the trustee that the court orders the debtor in possession not to perform.

11 U.S.C. § 1106(b). Although this catch-all language is expansive, it is subject to the interpretive canon *ejusdem generis*, which states that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar to those enumerated by the preceding specific words." *Circuit City Stores*, 532 U.S. at 114-15 (citation omitted). Sections (3) and (4) allow the examiner to "investigate the acts,

conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other [relevant] matter," and also to "file a statement of investigation." 11 U.S.C. §§ 1106(a)(3)-(4). Critically, these sections permit only investigating and reporting on that investigation — they stop far short of authorizing examiners to litigate based on their findings.

Therefore, although an examiner's proper role in Chapter 11 proceedings is hardly at issue in this case, we conclude that § 1106(b)'s broad grant is most naturally interpreted to authorize only acts relating directly to investigation. This conclusion comports with Congress's evident understanding of the examiner's role, for the sponsors of the Code stated: "The investigation of the examiner is to proceed on an independent basis from the procedure of the reorganization under chapter 11 in order to ensure that the examiner's report will be expeditious and fair." 124 Cong. Rec. H11,103 (daily ed. Sept. 28, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6472-73. This independent role would likely be jeopardized by an examiner's litigation against a debtor, and we therefore do not believe that an examiner can serve as a substitute for either a trustee or a creditors' committee for the purpose of avoiding fraudulent transfers.

### 3. Moving the court to order the debtor-in-possession to sue

The third option advanced is that a creditors' committee could move the bankruptcy court to order the debtor to file an avoidance action. In the case at bar, the Bankruptcy Court would no doubt have granted the Committee's motion to compel that action, for it made a finding of fact that the debtor's refusal to bring suit was unreasonable. But this solution is not realistic — given management's sometimes severe conflicts of interest, a court order to file an avoidance action would frequently amount to instructing management to sue itself. To put it mildly, that is unlikely to result in vigorous prosecution of the claim.

### 4. Converting the bankruptcy case to Chapter 7

The District Court observed that if the Committee could not bring a derivative avoidance action, it might instead

convert the case to a Chapter 7 liquidation or dismiss the petition pursuant to 11 U.S.C. § 1112. These solutions are far more radical than even the appointment of a trustee. Converting the case to Chapter 7 would cause the immediate appointment of a trustee, the option rejected *supra*, and would cause dissolution of the Committee. More importantly, though, Chapter 7 proceedings are liquidations, and this option would amount to instructing management: "Pursue this action, or we will move to dissolve your company." While that might yield results, such coercion is unlikely to yield a zealous prosecution of the claim. It also washes out the baby with the bath water, for the principal purpose of Chapter 11 is to avoid liquidating viable businesses.

Moving to dismiss the bankruptcy petition makes no more sense. Bankruptcy brings with it many advantages for a debtor, such as the power to avoid union contracts and to defer or even avoid short-term financial commitments. Dismissing a bankruptcy petition might therefore be the equivalent of forcing a company to close its doors. That, of course, is hardly an alternative to derivative standing.

### 5. Moving the bankruptcy court to authorize a committee to bring a post-confirmation avoidance action

Finally, *amicus* Smurfit-Stone notes that a creditors' committee might be authorized to bring a post-confirmation avoidance action in a plan of reorganization. *See* 11 U.S.C. § 1123(b)(3)(B). It submits that this would give a creditors' committee the ability to protect its interest in a variety of ways. First, although § 1121(b) provides a debtor-in-possession with 120 days of exclusivity in which to file a plan of reorganization, any extension of that period requires leave of court. *See* 11 U.S.C. § 1121(d). Smurfit-Stone suggests that a committee might object to any motion to extend that period unless the debtor-in-possession agrees to pursue the action itself, or to file a plan permitting the committee to pursue the action. Alternatively, a committee may safeguard its interests by filing its own plan of reorganization once the exclusivity period expires. Finally, the committee might move to terminate the exclusivity period in order to expedite the filing of its own plan.

These are indeed options open to committees, but like the other alternatives discussed *supra*, they would be far more disruptive to the reorganization process than the simple step of allowing a creditors' committee to sue derivatively. The problem with ending exclusivity, either by moving immediately or objecting to an extension of the initial 120-day window, is that it would lead immediately to a sea of direct claims that were previously channeled through the debtor. In other words, although a particular creditor might be able to sue to recover its fraudulently conveyed property, so too might every other creditor and claimant. To the extent Congress has determined that exclusivity is valuable to a reorganization, this would be a highly disruptive substitute. There is no reason to suppose that Congress intended to leave only this option available to creditors' committees when a debtor unreasonably refuses to pursue an avoidance action.

### 6. Summary

We conclude that, on balance, derivative standing is a valuable tool for creditors and courts alike in Chapter 11 proceedings, and we do not believe that any of the proffered alternatives could serve as a realistic substitute for that standing. Because it helps to ensure that creditors' claims are not frustrated by fraudulent transfers, derivative standing seems clearly to "give effect to the policy of the legislature." *Mitchell,* 361 U.S. at 292, and bankruptcy courts' equitable powers therefore allow them to confer such standing upon creditors' committees.


### VII. Conclusion

For the foregoing reasons, we are satisfied that bankruptcy courts can authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate. We will therefore reverse the District Court's decision denying the Committee derivative standing. We will remit to the original Panel of this Court the issues whether: (1) the Committee was required to identify a present creditor in order to sustain its fraudulent transfer claims; (2) Cybergenics had at least one unpaid creditor at the time of the alleged fraudulent transfer; (3) the heightened

pleading standard of Fed. R. Civ. Proc. 9(b) is applicable to the Committee's complaint; (4) the Committee was entitled to amend its complaint under Fed. R. Civ. Proc. 17(a); and (5) the Committee has abandoned its claim of equitable subordination.

FUENTES, Circuit Judge, with whom Circuit Judges Sloviter, Alito and Smith join, dissenting:

In this case, the majority interprets the phrase "the trustee may," in § 544(b)(1) of the Bankruptcy Code, to mean that the trustee *and* a creditors' committee may seek recovery under the statute. Although the majority does not conclude that the phrase is ambiguous or that its meaning is in any way obscure, it has, nonetheless, broadened the statute to add a party that Congress specifically omitted. The majority reasons that, while no specific statutory authority grants a creditors' committee standing, several Code provisions, pre-Code practice, public policy, and the bankruptcy court's equitable powers all combine to afford a creditors' committee "derivative" standing under § 544(b)(1). I respectfully disagree. The majority's view is inconsistent with the plain and natural reading of § 544, is not supported by the Code provisions it cites, is not adequately grounded in prior practice and, perhaps more importantly, is inconsistent with the Supreme Court's plain meaning analysis of the identical phrase in *Hartford Underwriters*. Accordingly, I respectfully dissent.

## I.

The central question here is whether the Committee has standing to seek relief under § 544(b)(1). I begin, as did the Supreme Court in *Hartford Underwriters*, with the observation that "Congress 'says in a statute what it means and means in a statute what it says there.'" 530 U.S. 1, 6 (2000) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)). I note as well that the "analysis of any statute, including the Bankruptcy Code, must not begin with external sources, but with the text itself." *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 459 (1999) (Thomas, J., concurring) (citing *Germain*, 503 U.S. at 253-54; *Union Bank v. Wolas*, 502 U.S. 151, 154 (1991)).

Section 544(b)(1) contains no textual ambiguity. The statute, by its express terms, provides for specific action and authorizes only the trustee to act. In *Hartford Underwriters*, the Supreme Court recognized that, "'[w]here

a statute . . . names the parties granted [the] right to invoke its provisions, . . . such parties only may act.' " 530 U.S. at 6-7 (quoting 2A N. Singer, Sutherland on Statutory Construction § 47.23, p. 217 (5th ed.1992)). The Court also observed that "a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Id.* at 6. That is precisely the circumstance here. Section 544 provides for the avoidance of "any transfer of an interest" of the debtor's property and it designates the trustee, and only the trustee, as the party who may act under the statute. We should not, therefore, presume that we have a free hand to broaden a right which Congress has made exclusive.

Clearly if Congress had wanted to authorize a party other than the trustee to invoke the remedies of § 544, it could simply have done so as it has in many other provisions of the Bankruptcy Code.[1] Since Congress has specifically

1. *See, e.g.*, § 110(h)(3) (naming the debtor, the trustee, a creditor, or the United States trustee); § 328(a) (naming the trustee or a committee appointed under § 1102, *i.e.* creditors' and equity security holders' committees); § 330(a)(2) (naming the court, the United States trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest); § 331 (naming a trustee, an examiner, a debtor's attorney, or any professional person employed under §§ 327 or 1103); § 343 (naming creditors, any indenture trustee, any trustee or examiner in the case, or the United States trustee); § 501(a)-(c) (naming creditors, an indenture trustee, an equity security holder, an entity liable to the debtor's creditor or that has secured such creditor, the debtor, and the trustee); § 503(b)(3)(D) (naming a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under § 1102); § 707(b) (naming the court and the United States trustee, and excluding any party in interest); §§ 727 (c)(1) and (d) (naming the trustee, a creditor, or the United States trustee); §§ 1104(a) & 1105 (naming a party in interest or the United States trustee); § 1110(b) (naming the trustee and the secured party, lessor or conditional vendor whose rights are protected under § 1110(a)); § 1112(b) (naming a party in interest and the United States trustee or bankruptcy administrator); § 1121(c) (naming any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture

authorized a creditors' committee to act in various other provisions of the Code, but has not done so with regard to § 544, we should " 'presume[ ] that Congress act[ed] intentionally and purposely in the disparate . . . exclusion.' " *Duncan v. Walker*, 533 U.S. 167, 173 (2001) (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997)). Indeed, as the Court noted in *Hartford Underwriters*, "the fact that the sole party named—the trustee—has a unique role in bankruptcy proceedings makes it entirely plausible that Congress would provide a power to him and not to others." 530 U.S. at 7.[2]

As the Supreme Court stated, when the language of a statute is plain, as it is here, " 'the sole function of the courts'—at least where the disposition required by the text is not absurd—'is to enforce it according to its terms.' " *Hartford Underwriters*, 530 U.S. at 6 (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). The plain text of § 544 makes clear that only the trustee may invoke the remedies under the statute.

## II. Other Code Provisions

The majority does not contend that enforcing § 544 as written would produce an absurd result. Nevertheless, the majority looks beyond the text of § 544 to determine whether a creditors' committee has "derivative" standing. Specifically, the majority asserts that §§ 1109(b) and 1103(c)(5) of the Bankruptcy Code, paired with

---

trustee); § 1164 (naming the Surface Transportation Board, the Department of Transportation, and any State or local commission having regulatory jurisdiction over the debtor); § 1224 (naming a party in interest, the trustee, or the United States trustee); § 1229(a) (naming the debtor, the trustee, or the holder of an allowed unsecured claim); § 1307(c) (naming a party in interest or the United States trustee); § 1329(a) (naming the debtor, the trustee, or the holder of an allowed unsecured claim).

2. Congress has extended the rights and powers vested in a trustee to a debtor in possession, but has made no analogous provision for a creditors' committee. *See* 11 U.S.C. § 1107(a).

§ 503(b)(3)(B), make it "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate." I respectfully disagree. The majority also contends that § 544 must be considered in light of the equitable powers of the bankruptcy courts, pre-Code practice, and policy concerns. I address these arguments in turn.

## A. *Section 1109(b)*

Section 1109(b) states that a "party in interest, including the debtor, the trustee, a *creditors' committee*, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, *may raise and may appear and be heard on any issue in a case under [Chapter 11]*." 11 U.S.C. § 1109(b) (emphasis added). This Court has liberally construed § 1109(b) to grant a creditors' committee a broad right to be heard, including among other powers, an unconditional right to intervene in a Chapter 11 adversary proceeding that has been initiated by a trustee. *See Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1232 (3d Cir. 1994); *Matter of Marin Motor Oil, Inc.*, 689 F.2d 445, 446 (3d Cir. 1982), *cert. denied*, 459 U.S. 1207 (1983).

However, this provision does not confer authority upon a creditors' committee to *initiate* an action when the trustee or debtor-in-possession declines to bring suit. Section 1109(b) only establishes a right to be heard by way of *intervention* as a party plaintiff when a proceeding has already been brought by the statutorily authorized party. Courts that have found authority for creditors to bring avoidance actions under this provision have noted that "a general right to be heard would be an empty grant unless those who had such a right were allowed to act when those who should act did not." *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1363 (5th Cir. 1986) (quoting 5 *Collier on Bankruptcy* ¶ 1109.02(3) (15th ed. 1986)). Yet § 544(b), read in light of *Hartford Underwriters*, grants an exclusive right of action to the trustee, and a broad "right to be heard" provision may not expand the intent evidenced by the plain, specific language used by Congress in § 544(b).

Any doubt on this question is eliminated by the Supreme Court's statement in *Hartford Underwriters*, albeit in dicta, indicating that the Court would not read § 1109(b) to allow a non-trustee to bring suit under a provision stating only that "the trustee may." After acknowledging that § 1109(b) was "by its terms inapplicable" in *Hartford Underwriters* because the case arose under Chapter 7 rather than Chapter 11, the Court stated, "[i]n any event, we do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to specific parties." 530 U.S. at 8-9 (citing 7 L. King, Collier on Bankruptcy & ¶ 1109.05 (rev. 15th ed. 1999) ("In general, section 1109 does not bestow any right to usurp the trustee's role as representative of the estate with respect to the initiation of certain types of litigation that belong exclusively to the estate.")). This is consistent with our prior interpretation of § 1109(b), and it strengthens my view of the statute.

## B. *Section 1103(c)(5)*

Section 1103(c)(5) of the Bankruptcy Code provides that "[a] committee appointed under section 1102 of this title may perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). This section does not, as the majority acknowledges, confer express authority for the Committee "independently to initiate an adversary proceeding, including one under § 544(b)." Nonetheless the majority argues that such authority may be found in the "flexible representation" role of a creditors' committee evidenced by § 1103(c)(5). I do not read § 1103(c)(5) to suggest, in any way, a committee's authority to file a lawsuit.

The powers granted to committees under § 1103(c)(1)-(4) are very specific. They include the power to (1) *consult* with the trustee or debtor, (2) *investigate* the debtor's acts and financial condition, (3) *participate* in the bankruptcy plan, and (4) *request* the appointment of an examiner.

None of these provisions support the authority to initiate a lawsuit. Since the grants of power in (1) to (4) are quite

narrow and non-adversarial, the catch-all power should be similarly confined. *See Federal Maritime Comm'n v. Seatrain Line, Inc.*, 411 U.S. 726, 734 (1973); *see also Norfolk and Western Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration."). Because Congress authorized only limited, discrete rights of participation for a committee in § 1103(c)(1)-(4), we should not read § 1103(c)(5) to grant a broad, implied power to initiate a suit under general language regarding "other services as are in the interest of those represented."

### C. *Section 503(b)(3)(B)*

The majority argues that, while §§ 1109 and 1103 provide "at best indirect evidence that Congress granted bankruptcy courts the power to confer derivative standing" upon creditors' committees, a third section, 503(b)(3)(B), provides "far more direct insight into bankruptcy courts' powers." I disagree on this point as well.

Federal courts have consistently held that § 503(b)(3)(B) does not itself confer standing. Instead, this section merely authorizes the recovery of certain administrative expenses incurred by "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B). Thus, this section "only authorizes recovery of expenses to a creditor who successfully recovered property, which is to say, a creditor who had standing in the first place." *In re SRJ Enterprises, Inc.*, 151 B.R. 189, 193 n.1 (Bankr. N.D. Ill. 1993). *See also In re Vogel Van & Storage, Inc.*, 210 B.R. 27, 32 n.4 (N.D.N.Y. 1997); *Surf N Sun Apts., Inc. v. Dempsey*, 253 B.R. 490, 492 (M.D. Fla. 1999). If a creditor does not have standing to prosecute a claim under § 503(b)(3)(B), there would seem to be even less support for the idea that this section confers *derivative* standing on a committee of creditors.

Nevertheless, the majority argues that "the most natural reading of § 503(b)(3)(B) is that it recognizes and rewards

monetarily the practice of permitting creditors' committees . . . to pursue derivative actions." I again disagree. The plain reading of § 503(b)(3)(B) is that it permits "a creditor," not a creditors' committee, to recover expenses. Indeed, the most prevalent use of § 503(b)(3)(B), based on my review of the cases citing this provision, is to compensate *individual creditors* who object to discharge and then successfully locate and bring into the estate assets that had been transferred or concealed by the debtor. *See, e.g., In re George*, 23 B.R. 686, 687 (Bankr. S.D. Fla. 1982); *In re Antar*, 122 B.R. 788, 791 (Bankr. S.D. Fla.1990); *In re Spencer*, 35 B.R. 280, 281 (Bankr. N.D. Ga. 1983); *In re Rumpza*, 54 B.R. 107, 108 (Bankr. D. S.D. 1985); *In re Humphrey's Pest Control Co., Inc.*, 1990 WL 191859, at \*2 (Bankr. E.D. Pa. Nov. 30, 1990), *aff'd*, 1991 WL 136195 (E.D. Pa. July 18, 1991). *See also* Judy Simmons Henry, *Recovery of Creditors' Costs from the Bankruptcy Estate: Reasonable, Necessary, and . . . Uncertain*, 18 U. Ark. Little Rock L.J., 199, 208-19 (1996) (discussing cases in which *individual* creditors have been allowed to recover their expenses under § 503(b)(3)(B)); Gregg D. Johnson, *Recovering a Creditor's Expenses and Legal and Accounting Fees as an Administrative Claim*, 5 Bankr. Dev. J. 463, 470-79 (1988) (same). In light of the plain language of the statute and its prevalent use, the majority's view that § 503(b)(3)(B) rewards creditors' committees for pursuing derivative actions is unpersuasive.

In fact, committees recover expenses under a different Code provision. That is because creditors' committees are typically represented by an attorney and § 330 of the Code specifically provides compensation for fees and expenses of the committee's representative. Sections 330(a)(1)(A) and (B) allow for "reasonable compensation" as well as "reimbursement for actual, necessary expenses" incurred by the committee's representative. 11 U.S.C. §§ 330(a)(1)(A), (B). In sum, § 503(b)(3)(B) is not the proper provision for awarding creditors' committees expenses and is not an appropriate basis from which to infer that Congress authorized creditors' committee derivative actions under § 544. *See In re S.W.G. Realty Associates, II, L.P.*, 265 B.R. 534, 539 (E.D. Pa. 2001) (explaining that creditors' committees' eligibility for compensation is based on

§ 330(a), not § 503(b)(3)(B)); *In re UNR Industries, Inc.*, 736 F.2d 1136, 1139 (7th Cir. 1984) (stating that § 330 "provides for reimbursement of expenses incurred by professional persons hired by the Committee with court approval . . .").

Neither §§ 1109(b), 1103(c)(5), or 503(b)(3)(B), taken separately or together, provide sufficient statutory authority for the practice invoked by the Committee and approved by the bankruptcy court in this case. Because these Chapter 11 provisions granting significant authority to creditors' committees do not go as far as to allow such committees to initiate avoidance actions, no matter whether the trustee fails to act and/or the creditors secure court approval, I cannot distinguish *Hartford Underwriters*, as the majority does, simply on the basis that *Hartford Underwriters* was a Chapter 7 case while here we consider a case under Chapter 11. The Committee urges this Court to go beyond a "cursory reading" of § 544(b) and examine other provisions of the Code. I have done so, and can find no provision which grants the Committee the authority denied to it in § 544(b).

### III. Reliance on Equity to Confer Standing

The majority writes that while "none of the three sections discussed—1109(b), 1103(c)(5), or 503(b)(3)(B)—seems directly to *authorize* . . . standing. . . . [w]e believe that the missing link is supplied by bankruptcy courts' equitable power. . . ." To be sure, bankruptcy courts are equitable tribunals that apply equitable principles. But courts of equity must still follow the law. *See Magniac v. Thomson*, 56 U.S. 281, 299 (1853) ("[w]herever the rights or the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim *equitas sequiter legem* is strictly applicable."). The Code is the law here and equity cannot be used to change the clear and plain language of a Code provision. This is especially true regarding a provision in which Congress explicitly specified the party authorized to act. As the Supreme Court has observed, whatever equitable powers bankruptcy courts have, they "must and can only be exercised within the

confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). In this regard, this Court has noted that equity does not " 'give the court the power to create substantive rights that would otherwise be unavailable under the Code.' " *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (quoting *In re Morristown & Erie R.R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989)); *see also In re Jamo*, 283 F.3d 392, 403 (1st Cir. 2002) (stating that equity may be invoked only if the equitable remedy dispensed by the court "is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code.").

What happens if we adopt the principle inherent in the majority's reasoning, that a court may use its equitable power to confer standing to a party that is explicitly omitted from a statute? The Code contains nearly 40 provisions that authorize only the trustee to act.[3] Could a bankruptcy

---

3. *See*, *e.g.*, § 108 (extending time for suits brought by the trustee); § 327(b) (allowing a trustee authorized to operate the business of the debtor to retain or replace professional persons employed by the debtor); § 327(e) (allowing the trustee to employ for a special purpose an attorney who has represented the debtor); § 345(a) (allowing a trustee to invest money of the estate); § 363(b)(1) (allowing the trustee to use, sell, or lease property of the estate other than in the ordinary course of business, after notice and a hearing); § 363(c)(1) (allowing the trustee to enter into transactions, "including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing"); § 363(f) (allowing the trustee to sell property free and clear of any interest in such property of an entity other than the estate); § 364 (allowing the trustee to incur secured and unsecured debt); § 365(a) (allowing the trustee to assume or reject executory contracts and unexpired leases; § 365(f)(1) (allowing a trustee to assign executory contracts and unexpired leases); § 505(b) (allowing a trustee to request a determination of unpaid tax liabilities of the estate); § 506(c) (allowing a trustee to surcharge property securing an allowed secured claim); § 545 (allowing the trustee to avoid statutory liens); § 547(b) (allowing the trustee to recover preferences); § 548(a)(1) (allowing the trustee to recover fraudulent transfers); § 549 (allowing the trustee to avoid post-petition transfers of estate property); § 550(a) (allowing the trustee to recover value of avoided transfers from initial and mediate transferees); § 554 (allowing the trustee to abandon property of the estate); § 1108 (allowing a trustee to operate the debtor's business); § 1113(a) (allowing the trustee to assume or reject collective bargaining agreements); § 1114(e)(1) (instructing the trustee to pay retiree benefits); § 1146(b) (instructing the trustee to make State or local tax returns of income for the estate of individual debtors).

court broaden standing to act under one provision or narrow standing under a different provision depending on its view of the equities involved? I would say not. If it were otherwise, the Supreme Court might very well have thought it "equitable" to broaden the phrase "the trustee may" in § 506(c) and allow the administrative claimant to recover in *Hartford Underwriters*. It did not. If the language of the Code is not ambiguous, it seems to me simply wrong to use equity to confer derivative standing where the statute specifically names the parties who may act.

For other reasons, I do not share the majority's confidence in relying on equity as a basis for expanding § 544(b) to permit creditors' committees to bring avoidance actions derivatively. In an analogous area, shareholder derivative actions, our jurisprudence demonstrates that equity should not be used to enlarge the category of eligible plaintiffs.

In the historical development of shareholder derivative actions, federal courts had attempted to use equity as the basis for enlarging the category of eligible plaintiffs and to permit equitable owners of stock to bring suit. *See, e.g., Arcola Sugar Mills Co. v. Burnham*, 67 F.2d 981, 982 (5th Cir. 1933), *cert. denied*, 292 U.S. 630 (1934) (enlarging the category of plaintiffs to include a pledgee of stock who had the right to protect his interests and prevent the dissipation of corporate assets). However, following the Supreme Court's decision in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), this Court was the first to hold that, for purposes of derivative actions, state substantive law squarely controlled the definition of an eligible plaintiff. *See Gallup v. Caldwell*, 120 F.2d 90, 93 (3d Cir. 1941); *see also* Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1826, at 44 n. 10 (1986). Implicit in our decision in *Gallup* is the notion that, for purposes of shareholder derivative actions, federal courts were no longer permitted to broaden the concept of a "shareholder" on the grounds of equity or otherwise. Although there are significant differences between shareholder derivative actions and § 544(b) actions, our experience with the former is relevant in one critical respect: where the text of a statute is unambiguous as to who may bring suit, principles of equity do not provide a basis for enlarging the category of eligible plaintiffs.

### IV. Pre-Code Practice and Policy Concerns

After completing its comprehensive textual analysis in *Hartford Underwriters*, the Supreme Court concluded: "[b]ecause we believe that by far the most natural reading of § 506(c) is that it extends only to the trustee, petitioner's burden of persuading [the Court] that the section must be read to allow its use by other parties is 'exceptionally heavy.'" 530 U.S. at 9 (citations omitted). The Supreme Court also explained that, while pre-Code practice informs the interpretation of statutory provisions that have "ambiguity in the text," pre-Code practice may not to be used as "an extratextual supplement." *Id.* at 10. Based on these principles, the Supreme Court held that the phrase "the trustee may" in § 506, the identical phrase found in § 544(b)(1) and under review here, "leaves no room for clarification by pre-Code practice" and that "[p]re-Code practice cannot transform § 506(c)'s reference to 'the trustee' to 'the trustee and other parties in interest.'" *Id.* at 11.[4]

I do not believe that the phrase "the trustee may," which the Supreme Court found to be unambiguous in one section of the Code, becomes ambiguous simply because it appears in a different Code provision. The fact that *Hartford Underwriters* involved a Chapter 7 proceeding while the present case involves a Chapter 11 proceeding is of no consequence because, as previously explained, no other Code provision under either chapter renders the phrase ambiguous or alters its meaning to allow courts to authorize derivative suits. Because the language of § 544 is clear, a review of pre-Code practice is totally unnecessary. The same is true with regard to the public policy concerns discussed by the majority. In light of the clear import of the language of § 544 and because the result that language commands is not absurd, there is no need to explore the public policy implications of derivative standing.

---

4. Amicus Brunstad conceded at oral argument that, were we to look to all circuit court decisions decided under the Bankruptcy Act, we would find only four or five that recognize derivative action by creditors' committees. A handful of cases do not suffice to meet appellants' "exceptionally heavy" burden of persuasion.

One final point. At oral argument, the Court and the parties explored other possibilities which may be available to creditors' committees, such as: (1) seeking appointment of a trustee or an examiner to pursue allegedly fraudulent transfers; (2) requesting a bankruptcy court order compelling the debtor in possession to act; or (3) seeking an order lifting the automatic stay to allow a creditors' committee to pursue a fraudulent transfer action in state court on the condition that any assets recovered are brought back to the estate. We are not called upon, in this case, to decide the viability of these or other possibilities. However, the many possibilities raised demonstrate that holding that creditors' committees lack derivative standing to pursue § 544 actions will not necessarily result in forfeiture of potentially valuable causes of action.

## V. Conclusion

The Bankruptcy Code does not authorize bankruptcy courts to grant derivative standing to creditors' committees and the Supreme Court has rejected the notion that the federal courts have any policy-making role in construing clear statutory language. If it is a good idea for creditors' committees to have standing, that is a matter for Congress, not the courts, to decide. *Hartford Underwriters*, 530 U.S. at 13-14. For the foregoing reasons, I would affirm the judgment of the District Court dismissing the Committee's complaint for lack of standing.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*