In re GREAT NORTHERN
PAPER, INC., Debtor.

Official Committee of Unsecured
Creditors, Appellant,

v.

Belgravia Paper Company,
Inc., Appellee.

Official Committee of Unsecured
Creditors, Appellant,

v.

BCC Equipment Leasing
Corp., Appellee.

Bankruptcy No. 03–10048–LHK.
No. 03–90–B–H.

United States District Court,
D. Maine.

Sept. 19, 2003.

See also 289 B.R. 497.

Daniel Bleck, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Great Northern Paper, Inc., Debtor–in–Possession.

Daniel W. Sklar, Peabody & Brown, Manchester, NH, Jay S. Geller, Law Office of Jay S. Geller, Portland, ME, Victor G. Milione, Boston, MA, for Official Committee of Unsecured Creditors, Appellant.

Robert J. Keach, Bernstein, Shur, Sawyer & Nelson, Portland, ME, Alex Terras, Law Office of Alex Terras, Chicago, IL, for Belgravia Paper Company, Inc., BCC Equipment Leasing Corp., Appellees.

Robert Checkoway, U.S. Trustee, Portland, ME, for Office of the U.S. Trustee.

## DECISION AND ORDER ON TRUSTEE'S MOTION TO SUBSTITUTE PARTIES AND BELGRAVIA PAPER COMPANY, INC.'S MOTION TO DISMISS APPEAL

HORNBY, District Judge.

What happens to a pending appeal by the Official Committee of Unsecured Creditors when the bankruptcy court converts a chapter 11 proceeding to a chapter 7 proceeding during the appeal? In this case, the chapter 7 Trustee claims that he succeeds to the Creditors Committee's interest in the appeal either as a matter of law or by virtue of a written assignment the

Committee's lawyer later executed. After oral argument held on September 18, 2003, I conclude that the Trustee may not maintain the appeal. The Trustee's motion to substitute parties under Fed.R.Civ.P. 25 is therefore DENIED and Belgravia's Paper Company, Inc.'s motion to dismiss the appeal is GRANTED.[1]

## FACTS

On January 9, 2003, Great Northern Paper ("GNP") filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code. GNP's largest creditor, Boeing/BCC Capital Equipment Corp. ("BCC"), financed the proceedings. A United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors Committee") according to Section 1102 of the Code on January 16, 2003. No other committees were appointed, and GNP as debtor-in-possession assumed control of the estate. Trustee's Opp'n at 4 (Docket No. 17). On February 5, 2003, the Bankruptcy Court issued an Interim Financing Order authorizing post-petition financing by BCC, secured by a superpriority and a lien on post-petition assets. The Interim Financing Order also established a timeline for accepting a stalking horse[2] bid, acceptance of competing bids, a hearing, and the order of a sale. Id.

On February 10, 2003, the debtor-in-possession accepted a Letter of Intent from Belgravia Paper Company, Inc. ("Belgravia"). The Letter of Intent provided that Belgravia would act as a stalking horse, and required a hearing to craft bid protection procedures acceptable to Belgravia. Belgravia insisted upon a reimbursement of expenses related to its stalking horse functions in the amount of $750,000, and a "break-up fee" of $5,000,000 in the event of a successful counter-bid that displaced it. Id. at 5.

Belgravia's break-up fee is the cause of this appeal. According to the Trustee, "[v]irtually every creditor represented in the Chapter 11 proceedings, except BCC, objected to the Break-up fee as being unnecessarily high." Id. at 6–7. The Bankruptcy Judge reviewed the Bid Procedures Order, applying the business judgment standard of review, and ultimately on February 18, 2003, found it to be a proper exercise of the debtor-in-possession's business judgment. The Creditors Committee objected to this standard of review, argu-

1. The case as postured does not present the question whether anyone else—for example a Chapter 7 committee—could succeed to the Official Committee's interest in the appeal. And I do not decide whether individual creditors have any relief available. See The Mediators, Inc. v. Manney (In re The Mediators, Inc.), 105 F.3d 822, 826 (2nd Cir.1997) (noting that creditors, qua creditors, may bring actions against third parties but the trustee may not undertake those actions on their behalf). I note with sympathy the Bankruptcy Judge's frustration that the question of standing is presented here in the District Court without a prior ruling by the Bankruptcy Court on what is perhaps a central bankruptcy issue. Special Counsel Hearing Tr. at 32, lines 4–9 (Docket No. 20). However, no one has suggested that the Trustee was required to seek the Bankruptcy Court's permission to pursue the potential asset that the appeal represents. See, e.g., The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 566–69 (3rd Cir.2003) (concluding that a creditors committee has derivative standing to sue only once approval from the Bankruptcy Court is sought and granted).

2. A "stalking horse" is a company chosen to make the first bid on a bankruptcy company. This method allows the distressed company to avoid low bids. Once the stalking horse has made its bid, other potential buyers may submit competing bids for the company's assets. The bid of the stalking horse sets the price so that other bidders will offer an adequately high purchase price.

ing that the correct standard is "the best interest of the estate and its creditors." *See* Statement of Issues to be Determined on Appeal at 5 (Docket No. 1). The Creditor's Committee filed an expedited motion for leave to file an appeal of the Bid Procedures Order, claiming both that the Order would deter other bidders and that if another bidder was successful, the payments to Belgravia would amount to a windfall at the expense of creditors. I denied that request, concluding that it would be possible to judge the effect of the Bid Procedures Order on bidding only after bidding had commenced, and that any result of the bidding would not prevent the Committee from raising its arguments later, on a clearer record. *See* Order on Expedited Motion, No. 03–Misc–17–B–H, Mar. 17, 2003.

The Bid Procedures Order set a deadline for accepting additional bids at 9:00 a.m. March 18, 2003, with a hearing on the sale to be held March 21, 2003. On March 21, 2003, the parties appeared in Bankruptcy Court with news that a bidder had appeared, but past the deadline and with a bid that arguably did not qualify for other reasons. The new bidder, Brascan, in turn objected to Belgravia's break-up fee alleging that Belgravia had failed to meet certain requirements of the Bid Procedures Order. Trustee's Opp'n at 8–9 (Docket No. 17). The hearing on the sale was continued to March 24. On that date, the parties appeared, notifying the Bankruptcy Judge that some of them had reached a settlement. Belgravia agreed to withdraw its objection to Brascan's late bid in return for Brascan dropping its objection to Belgravia's claim to the break-up fee.[3]

The Creditors Committee did not request a stay of the resulting sale. Instead, the Creditors Committee agreed to let the sale go through as proposed, but expressly reserved its right to appeal the original approval of the break-up fee.[4] The Sale Order issued on April 3, 2003. On April 11, 2003, the Committee appealed the Sale Order, designating the appeal to the District Court. The sale of GNP's mills to Brascan closed on April 29, 2003.

On May 13, 2003, the debtor-in-possession filed a Motion to Convert and/or Dismiss the Chapter 11 proceedings. The debtor-in-possession argued for conversion, stating that there would be surplus funds to distribute. The Creditors Committee argued in favor of dismissal, claiming at the hearing and in its motion that there would be no remaining funds to distribute to the unsecured creditors. On May 22, 2003, the Bankruptcy Court converted the case to a chapter 7 proceeding and appointed a trustee.

On June 6, 2003, the Trustee filed a motion to substitute himself as a party in the Creditors Committee's appeal to this court. Later, on July 22, 2003, the attorney for the Creditors Committee assigned "all of its right, title and interest, if any, in the appeal of the Belgravia Break-up Fee" to the Trustee, retroactive to May 22, 2003, the date the case was converted. Appellant's Ex. 4 (Docket No. 17).

### DISCUSSION

#### (1) Assignment

 I find first that the July 22, 2003, purported assignment of rights to the

---

3. The settlement also provided that Brascan and BCC would pay Belgravia an additional $500,000 "termination fee."

4. The sale order contains a "carve out" in paragraph 32 which states, "[n]othing in this Order shall affect the right of the Committee, if any, to appeal the Bid Procedures Order." *See* Order Approving Sale at ¶ 32 (Docket No. 11, Ex. 5) (Sale Order).

Trustee was void. Once the Chapter 11 case was converted to a Chapter 7 case, the Creditors Committee ceased to exist; the Creditors Committee's attorney therefore had no authority to make an assignment, nor did the Creditors Committee have any rights to assign.

A Chapter 11 Committee of Unsecured Creditors is appointed by the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1) of the Bankruptcy Code. When the statutory basis of the case is changed, either through dismissal or, as in this case, conversion, "the statute under which the Committee was created no longer applies and the committee is automatically dissolved." *Unsecured Creditors Committee of Butler Group, Inc. v. Butler (In re Butler),* 94 B.R. 433, 436 (Bankr. N.D.Tex.1989) (so ruling where the chapter 11 case was dismissed). Courts addressing the issue have consistently ruled that conversion of proceedings from Chapter 11 to Chapter 7 has the same effect on a creditors committee as dismissal of the proceedings, and I agree. *Creditors' Committee v. Parks Jaggers Aerospace Co. (In re Parks Jaggers Aerospace Co.),* 129 B.R. 265, 268 (M.D.Fla.1991) ("the committee permanently dissolves when the Chapter 11 proceeding is dismissed or converted to a Chapter 7 action."); *In re Freedlander, Inc. The Mortgage People,* 103 B.R. 752, 758 (Bankr.E.D.Va.1989) ("conversion to Chapter 7, and the ensuing termination of the Chapter 11 Order For Relief, results in the dissolution of any committee appointed under 11 U.S.C. § 1102 . . ."); *In re Kel–Wood Timber Products Co.,* 88 B.R. 93, 94 (Bankr.E.D.Va.1988) (same).

The Trustee has noted that in *In re SPM Mfg. Corp.,* 984 F.2d 1305 (1st Cir. 1993), the First Circuit decided an appeal taken by a Chapter 11 creditors committee after conversion to Chapter 7, without addressing the question of the committee's existence. Trustee's Resp. at 22 (Docket No. 17). But since the court did not rule in *SPM* on the issue presented here, it is not a precedent favoring either outcome.[5] I conclude that the Creditors Committee's lawyer had nothing to assign when he signed the July 22, 2003, "assignment."

*(2) Succession as a Matter of Law*

 Under 11 U.S.C. § 323, a trustee is the representative of the bankruptcy estate, with the capacity to sue and be sued. Statutes define a trustee's duties (11 U.S.C. § 704), some of which overlap those of the debtor-in-possession. 11 U.S.C. § 1107. The statutory similarity between the rights and duties of a trustee and those of a debtor-in-possession has been recognized by the courts. "Upon conversion and appointment, a trustee steps into the shoes of the debtor-in-possession with respect to all rights, responsibilities and liabilities." *Official Unsecured Creditors' Committee v. Rachles (In re S. Rachles, Inc.),* 131 B.R. 782, 785 (Bankr. D.N.J.1991).

 In succeeding to the rights of the estate as its representative, a trustee inherits a broader and somewhat more complex set of interests than are represented by a Chapter 11 creditors committee. A creditors committee need not take the best interests of the estate into consideration. *See In re SPM,* 984 F.2d at 1315–16. In-

---

5. In *SPM,* the creditors committee and a secured creditor had agreed during Chapter 11 for a percentage division of any proceeds. After conversion to Chapter 7 and a sale of assets, the bankruptcy and district courts ordered the secured creditor not to comply with

the agreement, but to pay the amount due the creditors committee to other creditors instead. The secured creditor considered itself only a stakeholder in the dispute and therefore the creditors committee appealed the lower courts' orders.

deed, a creditors committee is encouraged only to be vigilant with respect to the interests of its own constituency—the unsecured creditors. *Id.* at 1315 ("the committee is a fiduciary for those whom it represents, not for the debtor or the estate generally"). This is true in spite of the general "watchdog" function that those interests happen to provide in Chapter 11 proceedings. *See, e.g., In re AKF Foods, Inc.,* 36 B.R. 288, 289 (Bankr.E.D.N.Y. 1984) ("The function of a creditors' committee is to act as a watchdog on behalf of the larger body of creditors which it represents."); *In re Daig Corp.,* 17 B.R. 41, 43 (Bankr.D.Minn.1981) ("The committee ... will aid, assist, and monitor the debtor *pursuant to its own self-interest.*") (emphasis added).

■ Accordingly, when Chapter 7 proceedings commence it is the trustee that generally has standing to appeal, representing the interests of the estate. *See, e.g., Richman v. First Woman's Bank,* 104 F.3d 654, 657 (4th Cir.1997) ("As a general matter, in a Chapter 7 proceeding, the trustee alone has standing to raise issues before the bankruptcy court and to prosecute appeals."). More importantly for this case, the circuit courts have made it clear that when taking an appeal, a trustee is bound by the actions of the debtor-in-possession. "[I]t is axiomatic that the Trustee is bound by the acts of the debtor-in-possession...." *Armstrong v. Norwest Bank, Minneapolis, N.A.,* 964 F.2d 797, 801 (8th Cir.1992) (finding so with respect to stipulations involving cash collateral). *See also Paul v. Monts,* 906 F.2d 1468, 1473 (10th Cir.1990) ("The trustee, as successor to the debtor in possession, is bound by his predecessor's authorized actions."); *accord In re Superior Toy & Mfg. Co., Inc.,* 78 F.3d 1169, 1175–76 (7th Cir. 1996) (trustee is bound by the acts of her predecessor); *In re Buzzworm, Inc.,* 178

B.R. 503, 508 (Bankr.D.Colo.1994) (citing *Armstrong* ) (agreements of a Chapter 11 debtor-in-possession are binding against a subsequently appointed Chapter 7 trustee); *cf. Mediators,* 105 F.3d at 825–26 (the trustee may assert any claims that the debtor-in-possession could have instituted prior to filing for bankruptcy).

■ In this case, one of the debtor-in-possession's acts that now binds the Trustee is agreement to Belgravia's stalking-horse bid. Although it is clear from the pleadings that the debtor-in-possession was unhappy with the terms of the bid, it is equally clear that if the debtor-in-possession was to have a stalking horse at all, that stalking horse would be Belgravia. *See* Trustee's Opp'n at 5–7 (Docket No. 17). The debtor-in-possession also wanted the sale to Brascan to go through, and took appropriate steps during that negotiation to assure that it would. *Id.* at 9 (noting that the settlement was reached among BCC, Brascan, Belgravia and the debtor-in-possession). Both the sale order and the bid procedures order were entered at the request of the debtor-in-possession. Sale Order at 1 (Docket No. 1, Attach. 5); Mot. to Sell (Bankr.Docket No. 194). Even now, the Trustee has emphasized that it does not intend this appeal to unravel the sale to Brascan. Trustee's Opp'n at 27–28 (Docket No. 17).

In pursuing the Creditors Committee's challenge, however, the Trustee attacks the foundation of both the sale and the bid procedures order by arguing that the negotiated terms were unfair and that Bankruptcy Judge Kornreich applied the wrong legal standard in approving them. Thus, in his debtor-in-possession hat, the Trustee is seeking to maintain the Brascan/Belgravia sale. Yet the Trustee is also trying to wear the Creditors Committee's hat, challenging the Bid Procedures Order—the foundation on which the sale is built. The

two positions are flatly inconsistent. Indeed, the terms of the sale order itself illustrate that inconsistency: Paragraph 23 states that "[t]he terms and provisions of . . . this Order shall be binding in all respects upon . . . any trustee appointed in this chapter 11 case or any subsequent chapter 7 case for the Debtor." Sale Order at 13. Paragraph 32, on the other hand, preserves the Committee's objection to the terms of the Bid Procedures Order and, thereby the sale: "Nothing in this Order shall effect the right of the Committee, if any, to appeal the Bid Procedures Order." *Id.* at 15.

If I were to find that Bankruptcy Judge Kornreich applied the wrong standard of review in accepting the stalking horse breakup fee and upon remand Judge Kornreich were to find as a result that the breakup fee was too high, the whole premise of the eventual Brascan sale—the presence of the Belgravia stalking horse—is challenged. The Trustee argues that it is possible to defend the sale to Brascan while attacking the terms of the Bid Procedures Order, but I do not agree. It is true that the terms of the bid procedures order are not a condition of the sale to Brascan, and that the sale order builds in bona fide purchaser protection of Brascan to protect Brascan's position as buyer of the assets, but existence of a stalking horse was essential to the sale. The existence and presence of the stalking horse, Belgravia, fundamentally affected the terms negotiated by the debtor-in-possession with Brascan, negotiated upon Brascan's late arrival on the final day of the bidding period. These terms bind the Trustee. What the Trustee seeks is to retain the benefit (terms of the sale to Brascan) derived from the presence of stalking horse Belgravia, but escape the terms its predecessor accepted in order to obtain the stalking horse.

The Creditors Committee could have requested a stay of the sale, thereby keeping open the question of the effect of the Bid Procedures Order. It is obvious why it did not request a stay. All parties wanted Belgravia to stand as stalking horse and Brascan to buy out the debtor on terms enhanced by the existence of a stalking horse. Therefore the Trustee, stepping into the shoes of the debtor-in-possession and representing the interests of the estate, cannot attack the terms under which those agreements were made. The effect of allowing such an attack would, as Judge Kornreich noted, "have a chilling effect on the ability of debtors-in-possession to proceed in normal-course arrangements and compromises in Chapter 11 cases." Tr. at 30–31 (Docket No. 15, Ex. C). Entities will not deal with debtors-in-possession if their agreements are not binding. "Creditors must be able to deal freely with debtors-in-possession, within the confines of the bankruptcy laws, without fear of retribution or reversal at the hands of a later appointed trustee." *Armstrong*, 964 F.2d at 801. *See also Superior Toy*, 78 F.3d at 1176 (trustee cannot argue to overturn contracts entered into by predecessor in interest).

The Trustee argues that in *Rachles* a bankruptcy judge approved the substitution of a trustee for the creditors committee. *See Rachles*, 131 B.R. at 785. In that case, however, the creditors committee had filed an adversary complaint *on behalf of the debtor, id.,* alleging that certain transfers were fraudulent or constituted illegal preferences, thus explicitly and actually aligning itself with the debtor. *Id.* at 784. Here, by contrast, the Creditors Committee's position that the Trustee seeks to assume is not foursquare with the interests of the debtor. The policy justifications that the *Rachles* court provides for authorizing substitution and retroactive authorization of an adversary proceeding

initially undertaken on behalf of the debtor do not apply to this case.

The Trustee also argues from *Rachles* that "[t]he underlying rationale for permitting a creditors' committee to commence an adversary proceeding on behalf of a debtor is that the estate and its creditor body should not be deprived of the benefit of meritorious causes of action simply because the debtor could not or would not undertake such actions." *Id.* at 786. But that concern does not apply here. The choice presented to the debtor-in-possession was whether to seek a stalking horse bidder, not whether to file a complaint. The debtor-in-possession made the choice and obtained bankruptcy court approval, and the Creditors Committee elected to contest the terms of that deal. The debtor-in-possession could not contest the terms of the deal it struck with Belgravia; it wanted the deal, as the best it could get. The Creditors Committee's position attacking the terms was in conflict with that of the debtor-in-possession from the outset, and so it is now.

Finally, Belgravia does not realize an inappropriate windfall by the conversion to Chapter 7. If the proceedings had remained in Chapter 11, the Creditors Committee would still need to stay the sale in order effectively to appeal the bid procedures order. But no one ever wanted the sale upset. It is true that Belgravia has received a lot of money. That is due, however, to the strength of its bargaining position under the dire circumstances confronting GNP, the debtor-in-possession.

## CONCLUSION

At no time was the Creditors Committee's attack on the bid procedures order in harmony with the interests of the debtor-in-possession. To allow the Trustee to pursue the appeal would result in an attack on agreements that bind the Trustee as successor to the debtor-in-possession. The Trustee's motion to substitute parties under Fed.R.Civ.P. 25 is therefore DENIED and Belgravia's motion to dismiss the appeal is GRANTED.[6]

So ORDERED.

---

**6.** Belgravia also raises the question of mootness under 11 U.S.C. § 363(m). *See* Mot. to Dismiss at 12 (Docket No. 5). Since the Creditors Committee and the Trustee have made clear that they do not want the sale overturned, and because this appeal that threatens the Bid Procedures Order is denied, there is no need to address this argument.